The JOINT BOARD OF CONTROL OF the FLATHEAD, MISSION AND JOCKO IRRIGATION DISTRICT, Plaintiff,

v.

The UNITED STATES OF AMERICA; The United States Department of the Interior; The Honorable Donald Hodel, Secretary of the Interior; The Bureau of Indian Affairs, an agency within the Department of Interior; Stanley Speaks, Director, Portland Area Office, Bureau of Indian Affairs; and the Flathead Irrigation and Power Project, an agency within the Bureau of Indian Affairs; Defendants,

and

The Confederated Salish and Kootenai Tribes of the Flathead Reservation, Intervenor-Defendant.

No. CV–86–156–M–CCL.

United States District Court, D. Montana, Missoula Division.

Oct. 16, 1986.

Stanley T. Kaleczyc, J. Daniel Hoven, Lisa Leckie, Browning, Kaleczyc, Berry & Hoven, P.C., Helena, Mont., for plaintiff.

Robert Brooks, Asst. U.S. Atty., Butte, Mont., for defendants.

James H. Goetz, Goetz, Madden & Dunn, P.C., Bozeman, Mont., Daniel F. Decker, Legal Dept., Confederated Salish & Kootenai Tribes, Pablo, Mont., for intervenor-defendant.

## OPINION AND ORDER

LOVELL, District Judge.

### INTRODUCTION

For the second consecutive year these same parties are before the Court quarreling over water allocation on the Flathead Indian Reservation.

In July 1985, the Confederated Salish and Kootenai Tribes of the Flathead Indian Reservation ("Tribes") commenced an action to enjoin the dewatering of streams and reservoirs on the Reservation for irrigation. The Tribes claimed that distribution of water by the Flathead Irrigation Project ("FIP" or the "Project") was threatening the existence and preservation of tribal fisheries, in violation of the Hell

Gate Treaty of 1855, 12 Stat. 975. The United States was named as a defendant and appeared to defend the Project, which is administered by the Bureau of Indian Affairs, Department of the Interior (BIA). Upon motion, the Court permitted intervention of the Joint Board of Control of the Flathead, Mission and Jocko Valley Irrigation Districts ("JBC"), which represents the 2,600 water users served by FIP, and of the State of Montana, which claimed an interest arising from its statewide water adjudication process.

Following issuance of a temporary restraining order, the Court set hearing on the Tribes' motion for preliminary injunction. At the time of hearing, the Court was presented with a stipulation between the Tribes and the United States, setting forth certain procedures by which instream flows were to be established and providing designated minimum instream flows for particular streams and minimum levels for particular reservoirs. The agreement by its terms was to expire October 31, 1985.

Upon acceptance of the stipulation by all parties, the Court dismissed the action without prejudice as moot. *See Confederated Salish and Kootenai Tribes v. Flathead Irrigation and Power Project, et al.,* 616 F.Supp. 1292 (D.Mont.1985).

On August 4, 1986, the JBC filed the present action for injunctive relief, claiming that in its efforts to develop a water management plan for the 1986 irrigation season, the BIA abused its discretion by wholly failing to consider the rights and interests of JBC members. Again, the United States and its pertinent agencies and officials were the only defendants named. The Court granted a motion to intervene by the Tribes and, after an ex parte hearing at which both sides appeared, on August 6, 1986, issued a Temporary Restraining Order enjoining the Project from continuing implementation of the 1986 interim flows established by the BIA.

Hearing on the JBC's motion for preliminary injunction commenced August 25, 1986, and continued until August 28. The court has considered fully the testimony presented at the hearing by witnesses for all parties, the extensive documentary evidence submitted, affidavits contained in the file, and the briefs aptly prepared and submitted by counsel.

## JURISDICTION

The Court's jurisdiction to entertain this action is based upon 28 U.S.C. § 1331 and 5 U.S.C. § 702. The existence of jurisdiction is disputed by all defendants.[1] The United States asserts that neither the federal question statute nor the Administrative Procedure Act constitutes a waiver of its sovereign immunity, but that there must be an independent basis for federal jurisdiction and an independent ground showing consent to be sued.

The Government further claims that jurisdiction cannot be grounded on any nebulous fiduciary or trust duty owed by the BIA to the irrigators, because no such fiduciary relationship exists. The United States asserts that there is no other independent statutory or contractual basis for federal jurisdiction, and that the action must therefore be dismissed.

Finally, the government asserts that regardless of the Court's caution to avoid water rights adjudication, any order affecting the distribution of water will necessarily impact upon prioritization and quantification of water rights and thus that the Court should refrain from exercise of jurisdiction in the interests of wise judicial administration.

These arguments are without merit. The United States correctly asserts that the Administrative Procedure Act does not provide an independent basis of jurisdiction to review agency actions. *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980,

---

1. The Tribes make no argument on this point, but merely adopt the contentions advanced by the United States; therefore, the Court will refer only to the United States when discussing the jurisdictional claims raised. In the 1985 proceeding the JBC vigorously disputed jurisdiction as did the United States.

984, 51 L.Ed.2d 192 (1977). The Ninth Circuit Court of Appeals has held that section 702 of the APA does, however, waive sovereign immunity in non-statutory review actions for non-monetary relief brought under 28 U.S.C. § 1331. *See Assiniboine and Sioux Tribes v. Board of Oil and Gas,* 792 F.2d 782, 793 (9th Cir.1986), and cases cited therein.

■ Moreover, the APA permits judicial review of agency actions where the claim for relief is keyed to another federal statute and there is no specific provision in the statutory scheme that precludes review. *See Presidio Bridge Co. v. Secretary of State,* 486 F. Supp. 288, 293 n. 1 (W.D.Tex.1978). A right to judicial review is presumed unless a statute precludes review or the action is one committed to agency discretion. *Assiniboine and Sioux Tribes v. Bd. of Oil and Gas, supra,* 792 F.2d at 791; 5 U.S.C. § 701. The administration of Indian Irrigation Projects is governed by 25 U.S.C. § 381, *et seq.,* and the regulations promulgated thereunder. There is no indication that Congress intended judicial review to be precluded under this scheme.

■ The "committed to agency discretion" exception to the presumption of reviewability has been narrowly construed, and applies only "in those very limited circumstances in which Congress has drafted a statute so that the courts have 'no meaningful standard' against which to judge the agency's exercise of discretion.," *Assiniboine and Sioux Tribes v. Bd. of Oil and Gas, supra,* 792 F.2d at 791. The regulations under 25 U.S.C. § 381 provide sufficient standards by which to judge the BIA's actions herein; thus, the Court finds that neither exception to the presumption of reviewability applies to this case, and that jurisdiction is proper under 5 U.S.C. § 702 and the rule stated in *Assiniboine and Sioux. See also, Northern Cheyenne Tribe v. Hodel,* CV 82–116–BLG (D. Mont. Memorandum Opinion dated 5/28/85) slip op. at 8 (motion for reconsideration pending).

■ The United States also suggests that jurisdiction is improper because the plaintiff has failed to exhaust its administrative remedies. Unless application of the doctrine of exhaustion is statutorily mandated, its application rests within the discretion of the district court. *Assiniboine and Sioux Tribes, supra,* 792 F.2d at 790; *Southeast Alaska Conservation Council v. Watson,* 697 F.2d 1305, 1309 (9th Cir. 1983). More importantly,

> [e]xhaustion of administrative remedies is not required where administrative remedies are inadequate or not efficacious, where pursuit of administrative remedies would be a futile gesture, where irreparable injury will result unless immediate judicial review is permitted, or where the administrative proceeding would be void.

*Watson, supra,* 697 F.2d at 1309, *citing Aleknagik Natives, Ltd. v. Andrus,* 648 F.2d 496, 499 (9th Cir.1980). As in *Watson,* exhaustion will not be required in this case, where an immediate decision is required on the appropriateness of a preliminary injunction.

■ Finally, the Court rejects the Government's contention that exercise of jurisdiction should be deferred under *Arizona v. San Carlos Apache Tribe,* 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983). *San Carlos,* following the decision in *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), held that a federal district court should consider several factors, including whether the state has a comprehensive water rights adjudication and management system, and determine whether dismissal of the federal suit in favor of state proceedings is justified by wise judicial administration and efficiency. There is no rule that even a pending state action adjudicating water rights automatically deprives the district court of jurisdiction over issues implicating water. *Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 763 F.2d 1032, 1034–35 (9th Cir.1985).

Following this Court's opinion in *Confederated Salish and Kootenai v. Flathead*

*Irrigation & Power Project, supra,* the Supreme Court of Montana handed down its ruling that the disclaimer language contained in Article I of the Montana Constitution of 1972 does not bar state jurisdiction to adjudicate Indian reserved water rights, and that the Montana Water Use Act, Title 85, ch. 2, Mont. Code Ann., is adequate on its face to adjudicate Indian and federal reserved water rights. *State of Montana v. Confederated Salish and Kootenai Tribes, et al.,* Mont., 712 P.2d 754 (1985). The United States intimates that because the state supreme court has now held that Montana's water adjudication process will be applied to Indian and federal reserved water rights, this Court should defer exercise of jurisdiction to the state courts.

Under the principles of *Kittitas Recl. Dist., supra,* and *United States v. Adair,* 723 F.2d 1394 (9th Cir.1983), this Court will exercise its jurisdiction to resolve particular disputes arising under federal law. The Court has stated to these parties, both a year ago and throughout the present litigation, that it has no intention of adjudicating water rights. *See* 616 F.Supp. at 1298. The Court is anxious for the state water adjudication process to reach the Flathead Indian Reservation, but there are indications that this may not occur until as late as 1990.[2] Clearly, there is no state forum available at this time for the parties to air their differences over the water management problems existing on the Reservation. *San Carlos* does not prohibit this Court from hearing and deciding such emergencies prior to the actual adjudication of rights by the state courts.

## STANDARD OF REVIEW

1. Review of Agency Action.

 The Court may set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency decisions may be re-

versed only if no reasonable basis for the decision has been given by the agency. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), *reh'g denied,* 420 U.S. 956, 95 S.Ct. 1340, 43 L.Ed.2d 433. The court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

 The interpretation of a statute or regulation by the agency charged with its administration is granted substantial deference. *Kidd v. United States Dept. of Interior, Bureau of Land Management,* 756 F.2d 1410, 1412 (9th Cir.1985). Deference requires affirmance of any interpretation within the range of reasonable meanings the words permit, comporting with the statute's clear purpose. *Alcaraz v. Block,* 746 F.2d 593, 606 (9th Cir.1984).

 On the other hand, the courts are the final authorities on issues of statutory construction, and must reject administrative constructions of a statute inconsistent with a statutory mandate or that frustrate the policy Congress sought to implement. *State of Alaska v. Lyng,* 797 F.2d 1479, 1482 (9th Cir.1986).

 Ordinarily, judicial review of agency action is limited to a review of the administrative record. *Friends of the Earth v. Hintz, et al.,* 800 F.2d 822, 829 (9th Cir.1986). There are limited exceptions, however, when consideration of evidence outside the administrative record is necessary to explain agency action. *Id.,* at 830.

When there is "such a failure to explain administrative action as to frustrate effective judicial review," the court may "obtain from the agency, either through affidavits or testimony, such additional

---

**2.** *Comprehensive Review Report, Flathead Indian Irrigation Project,* p. 1–7, (October 1985) (admitted at the preliminary injunction hearing as

Intervening Defendant's Exhibit C, and hereinafter referred to as *Comprehensive Review* ).

explanations of the reasons for the agency decision as may prove necessary." *Id., quoting, Public Power Council v. Johnson,* 674 F.2d 791, 793–94 (9th Cir. 1982). The Court cannot, however, affirm any agency action by accepting post hoc rationalizations of counsel that are not grounded in the administrative record. *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962), *citing, Securities and Exchange Comm. v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). *Accord, Northern Cheyenne Tribe v. Hodel, supra,* slip op. at 36.

> The purpose of the court's enquiry [sic] should be to ascertain whether the agency considered all relevant factors or fully explicated its course of conduct or grounds of decision.

*Friends of the Earth v. Hintz, supra,* at 830.

2. Standard for Preliminary Injunctive Relief.

██ To obtain a preliminary injunction within the Ninth Circuit, a party must show either:

> (1) a likelihood of success on the merits and the possibility of irreparable injury; or
>
> (2) the existence of serious questions going to the merits and the balance of hardships tipping in its favor.

*Apple Computer, Inc. v. Formula International, Inc.,* 725 F.2d 521, 523 (9th Cir. 1984). These are not separate tests, but "the outer reaches 'of a single continuum.'" *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1201 (9th Cir.1980).

For the reasons discussed herein, the Court finds that the JBC has shown substantial likelihood of success on the merits and a possibility of irreparable injury.

---

## THE FLATHEAD
## IRRIGATION PROJECT

By Act of Congress on April 23, 1904, the Flathead Indian Reservation was to be surveyed and allotments made to "all persons having tribal rights with said confederated tribes," and the surplus lands opened to settlement and entry by proclamation of the President.[3] Presidential proclamation formally opened the Reservation for settlement on May 22, 1909.[4] Shortly thereafter, the United States published a map of the Flathead Lake area advertising tracts of federal land, or "villas," for sale.

The Act of June 21, 1906 (34 Stat. 354) amended the Act of April 23, 1904, by adding the following section:

> Sec. 19. That nothing in this act shall be construed to deprive any of said Indians, or said persons or corporations to whom the use of the land is granted by this act, of the use of water appropriated and used by them for the necessary irrigation of their lands or for domestic use or any ditches, dams, flumes, reservoirs constructed and used by them in the appropriation and use of said water.

In 1908, Congress provided for surveying and planning of irrigation systems to irrigate both the allotted lands of the Reservation and the unallotted irrigable lands to be disposed of under the Act of April 23, 1904.[5] Congress also amended Section 9 of the Act of April 23, 1904,[6] to provide for acquisition of water rights by settlers, and payment therefor before such rights would permanently attach.[7]

By Act of March 3, 1909 (35 Stat. 795), Congress appropriated $250,000 for construction of irrigation systems on the Flathead Reservation for both allotted and unallotted lands. Thereafter, Congress passed a number of appropriations bills to continue construction and maintenance of

---

3. 33 Stat. 302, 303 (Sec. 2), 304 (Sec. 9).

4. 36 Stat. 2494.

5. Act of April 30, 1908 (35 Stat. 83).

6. See note 3, *supra.*

7. Act of May 29, 1908 (35 Stat. 448).

the Flathead irrigation system.[8] Each appropriation prior to 1916 was to be reimbursed from proceeds of the sale of lands and timber within the Reservation (35 Stat. 795). The Act of May 18, 1916 (39 Stat. 141), provided that all tribal funds used for the irrigation project should be returned and that payments for the irrigation work should be made by the land benefitted. By Act of May 25, 1948, Congress established a permanent subsidy of the irrigation system construction and operation and maintenance costs. (*Comprehensive Revenue* at 1–3.)

The irrigable area of the project was first set at 152,000 acres, although that area was later reduced and now stands at 127,000 acres (*Comprehensive Review*, at 1–1). The Preston-Engle Report, consisting of an extensive study completed in 1928 of all Indian irrigation projects in the United States, provides a thorough background of the Flathead Irrigation Project and a detailed analysis of the reservoirs and storage features in each of the three divisions, as it existed at the time, as well as a summary of climate conditions on the Reservation and a study of water supply and irrigation development. At the time the study was conducted, Indians were irrigating 452 acres, or 1.3 per cent, of the 34,441 acres then irrigated. (71st Cong. 2d Sess., pt. 6 at 2217).

Today, the Project continues to serve both Indian and non-Indian water and power users. Approximately 90 percent of the water users are non-Indian. *Comprehensive Review* at 1–1. The power division of the Project serves close to 14,000 meters, and subsidizes the irrigation division; about 90 percent of FIP revenue is derived from power sales. *Id.*

## ISSUES NOT BEFORE THE COURT

Immediately prior to the commencement of hearing the motion for preliminary injunction, the Court informed the parties that it considered this case to present an "agency abuse of discretion" question. The parties were instructed not to concentrate their efforts on specific water rights of any party or other areas tangential to the central issue. Nonetheless, both during the hearing and in the briefs, many issues were raised and facts disputed which the Court believes unnecessary to a determination of the issues before it.[9] To illuminate the matters which are critical to the disposition of this litigation, I note that the following will not be decided herein.

1. This case will *not* adjudicate the priority or quantity of legal rights to the waters of the Flathead Indian Reservation. The Tribes have insistently argued that this action was triggered by the mere yielding of junior water rights to senior water rights. This is the same position advanced by the Tribes one year ago, and again, the Court emphatically declines to prioritize water rights.

It should be noted that the Stipulation of 1985 between the Government and the Tribes, which was entered into "[i]n recognition and acknowledgment of the Tribes' aboriginal rights," was neither approved by

---

8. The following list was obtained from *Survey of Conditions of the Indians in the United States,* Hearings before a Subcommittee of the Committee on Indian Affairs, United States Senate, 71th Cong.2d Sess., pt. 6 (1930) (hereinafter referred to as the "Preston-Engle Report"), and is not intended to be exclusive.

| | |
|---|---|
| Act of April 4, 1910 (36 State. 277): | $250,000 |
| Act of March 3, 1911 (36 Stat. 1056): | $409,000 |
| Act of August 24, 1912 (37 Stat. 526): | $209,000 |
| Act of June 30, 1913 (38 Stat. 90): | $325,000 |
| Act of August 1, 1914 (38 Stat. 593): | $200,000 |
| Act of May 18, 1916 (39 Stat. 139): | $750,000 |
| Act of Marc 2, 1917 (39 Stat. 980): | $750,000 |
| Act of May 25, 1918 (40 Stat. 574): | $375,000 |
| Act of June 30, 1919 (41 Stat. 16): | $375,000 |
| Act of February 14, 1920 (41 Stat. 408): | $200,000 |
| Act of March 3, 1921 (41 Stat. 1225): | $200,000 |
| Act of May 24, 1922 (42 Stat. 559–580): | $200,000 |
| Act of January 24, 1923 (42 Stat. 1174): | $555,000 |
| Act of June 5, 1924 (43 Stat. 390): | $150,000 |
| Act of March 3, 1925 (43 Stat. 1146): | $ 35,000 |
| Act of March 3, 1925 (44 State. 458): | $575,000 |
| Act of January 12, 1927 (44 Stat. 934): | $ 25,000 |

The total cost of the Project to June 30, 1936, was $7,499,105.85. *U.S. v. McIntire,* 101 F.2d 650, 652 (9th Cir.1939).

9. This is not to say these matters are of no consequence. Many of the underlying issues are important to the Court's decision and, if nothing else, the hearing provided counsel a good preview for presentation of their respective cases to the state water court.

the Court nor incorporated into the record or the Court's order. *See* 616 F.Supp. at 1297. Thus, although I am sympathetic to the parties' frustrations over the lack of adjudication of their rights, no determination in that respect will be made in this federal forum in this case.

2. There will be no determination of how apportionment of the waters is to be made in the event of insufficient water to serve all needs. Eventually a situation may arise where the Flathead Reservation is faced with a true water crisis. At this point, however, no party has proved that there is not enough water to meet irrigation and fishery needs.

3. Although a considerable portion of the hearing was devoted to the specifics of different methodologies which may be used in measuring water for instream flow levels, the Court does not see fit to instruct the BIA that it must use a particular method at a particular place or for a particular reason. The Court sees advantages and disadvantages to both the Wetted Perimeter Method and the Instream Flow Incremental Method, including time and cost factors, thoroughness of evaluation, and others.

4. There is clear and undisputed evidence that FIP is in a state of disrepair and in need of rehabilitation. The Secretary of the Interior commissioned a comprehensive examination of the Project for this very purpose. (*Comprehensive Review* at 1–1.) The Court, however, is not going to make findings on the causes of water problems within the Reservation or who is responsible for the same. I am not concerned with the obvious troubles caused by deteriorating reservoirs, excessive seepage, low snowpack or other extraneous problems, except to the extent, if any, that these factors pertain to the showing of irreparable injury to the JBC as a result of the BIA's actions.

5. There has been mention of Indian preference in hiring laws and the propriety, or lack thereof, in utilizing Tribal technical staff to assist in determining minimum instream flow levels. The Court has no concern about the competency of Tribal staff, and in fact the affidavits and materials on file indicate highly qualified Tribal personnel. But the issue in this regard is not whether the Tribes retain competent hydrologists and biologists. Rather, the question is whether the Portland Area Director of the BIA relied exclusively on Tribal input in rendering a decision and, if so, whether that was an abuse of discretion.

6. The Court will make no findings of fact directed to the quantity of water a crop of alfalfa requires at any given point during the summer, or whether it should be grazed after the final cutting, or the proper number of cuttings a prudent farmer should get each year in the Flathead. Different farmers operate differently, and whether or not conditions in the Jocko Division differ from conditions in the Mission Valley, such findings are immaterial to the ultimate disposition of the case.

7. Finally, this opinion is intended to establish no precedent for any party's use in the state of Montana's water adjudication process. The purpose of this decision is to provide interim guidance to the BIA, the Tribes, and the JBC until a final adjudication of water rights is made.

Moreover, at this stage of the case the Court is ruling on a motion for preliminary injunction. Since this is not an ultimate decision I have determined that it would be inappropriate to enter specific findings of fact at this time.[10]

## MERITS OF PLAINTIFF'S MOTION

1. Possibility of Irreparable Injury.

At the time the temporary restraining order was issued in this case, the Court

---

**10.** If the parties so stipulate, pursuant to Rule 65(a)(2), Fed.R.Civ.P., the need for trial on the merits can be eliminated by agreement that the Court has all necessary evidence before it. In that event, this opinion and order would stand as the Court's final ruling. Otherwise, the evidence submitted thus far will become a part of the record on the trial and need not be repeated. Rule 65(a)(2), Fed.R.Civ.P.

found a threat of immediate and irreparable injury that stored water for irrigation in the Jocko Division would be depleted by August 13, a critical period in the irrigation season.

The Tribes maintain that the JBC has suffered no irreparable injury of the type contemplated by Rule 65. The only injury, if any, the Tribes claim, is economic damages and thus the irrigators have an adequate remedy at law.

■ It is true that economic loss, in and of itself, does not ordinarily constitute the irreparable harm required to support injunctive relief. *Wisconsin Gas Co. v. F.E. R.C.,* 758 F.2d 669 (D.C. Cir.1985). On the other hand, future injury of uncertain date and incalculable magnitude is irreparable harm, and protection from such injury is a legitimate end of injunctive relief. *Phillips v. Crown Central Petroleum Corp.,* 602 F.2d 616, 630 (4th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1021, 62 L.Ed.2d 756 (1980).

In this case, there was substantial evidence that serious crop damage would result from lack of water if implementation of the 1986 interim flows was not enjoined. There was also evidence that repercussions of that damage would be felt for years. Balancing the hardships which would befall the parties, the Court believed that the instream flow could be reduced to afford water for irrigation while still posing no threat to the fishery. The alternative might have been to allow crops to dry out, resulting in root damage; to force the irrigators to bring another suit for collection of damages, to wait for discovery, motions, and trial before a determination of compensation would be made; and in the meantime to have unproductive farms sitting in the Flathead Valley, where farmers already suffering from the previous drought year and threatened with foreclosure could hardly afford another year of loss. On that basis, the Court believes there was sufficient threat of irreparable injury.

■ Now the United States, observing that irrigation needs are past and there is no longer a threat of irreparable injury, appears to suggest that the matter is moot.[11]

Generally, a case becomes moot " 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.' " *Murphy v. Hunt,* 455 U.S. 478, 481, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) [citations omitted]. Thus it is possible that, because the 1986 irrigation season is effectively at an end, and because the 1986 Interim Instream Flow and Reservoir Pool Level Agreement expires by its own terms on October 31, 1986, the issue is no longer "live" and the controversy is moot. In *Murphy v. Hunt,* however, the Supreme Court stated:

> We have recognized an exception to the general rule in cases that are "capable of repetition, yet evading review." In *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347 [348], 46 L.Ed.2d 350 (1975) (per curiam), we said that "in the absence of a class action, the 'capable of repetition, yet evading review' doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again."

*Murphy,* 455 U.S. at 482, 102 S.Ct. at 1183. Under this test, a mere physical or theoretical possibility is not sufficient. There must be a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party. *Id.*

Construing the "repetition/evasion" exception, the Ninth Circuit Court of Appeals has held it to be very narrow, to be applied only in "exceptional situations." *Lee v. Schmidt-Wenzel,* 766 F.2d 1387, 1390 (9th

---

11. Even if the United States did not intend this suggestion, the Court is obligated to consider a potential mootness problem on its own initiative. *See Kittitas Reclamation Dist. v. Sunnyside Valley Irrigation Dist., supra,* 763 F.2d at 1034 n. 1.

Cir.1985), *quoting Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). The exception "usually is applied to situations involving governmental action where it is feared that the challenged action will be repeated." *Lee,* 766 F.2d at 1390. The emphasis is on continuity of the parties. *Id. See also United States v. Max,* 779 F.2d 1415 (9th Cir.1986).

This case falls squarely within the repetition/evasion exception to the mootness doctrine. Demonstrated by the second annual appearance of identical parties, the dispute is capable of repetition. Although the issues in this case are not identical to the issues of last year's dispute, the underlying dilemma is the same. The root of the problem is the BIA's administration of the Project, but it comes to a head each year when the waters are becoming scarce. By the time the Court has an opportunity to examine the issues, there either is no water left to apportion or the irrigation season is over. In either situation, the immediacy of the problem has subsided, and it evades review. Therefore, the court will proceed under the finding that this matter is capable of repetition, yet evading review.[12]

2. Likelihood of Success on the Merits.

 The JBC alleges that the BIA breached a fiduciary duty to the irrigators; breached an implied statutory obligation properly to operate, maintain, and administer the Project; violated its own regulations; and deprived the irrigators of their constitutional right to be protected from a taking of property without due process of law. The BIA claims that it considered the matter fully before making a determination, and that the methods used were reasonable under the circumstances, given time and cost restraints. The government further asserts that the JBC had a meaningful opportunity to participate in the process and chose not to do so. The Tribes echo the contentions of the United States and further argue that the government, as fiduciary, has an obligation to act in the

Tribes' best interests, and need not include the Tribes' adversaries in all of the decision-making processes. The Tribes claim that the BIA was only fulfilling its obligation to allow priority of a senior water right over a junior water right.

For the Court to grant a preliminary injunction, there must be a showing that the JBC is likely to succeed on its argument that the BIA acted arbitrarily, capriciously, or in abuse of discretion in the method by which it established the 1986 interim instream flows and pool levels.

Since the Supreme Court's decision in *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), a unique relationship has been held to exist between the United States government and federally recognized Indian tribes. Generally, the special relationship imposes strict fiduciary standards of conduct on federal executive agencies in their dealings with Indian tribes. *See United States v. Creek Nation,* 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); *Northern Cheyenne Tribe v. Hodel, supra,* slip op. at 23.

The trust responsibility has been recognized with respect to enforcement and protection of tribal water rights. *Pyramid Lake Paiute Tribe of Indians v. Morton,* 354 F.Supp. 252 (D.D.C.1972). The Ninth Circuit also has emphasized the right to reserved water on Indian reservations for hunting and fishing purposes. *United States v. Adair,* 723 F.2d 1394 (9th Cir. 1983); *Colville Confederated Tribes v. Walton,* 647 F.2d 42 (9th Cir.1981) [*Walton II*].

This Court, by issuing a temporary restraining order in *Confederated Salish & Kootenai Tribes v. Flathead Irrigation Project,* recognized the importance of preserving the naturally reproducing fish in the streams and reservoirs within the Reservation. *See* 616 F.Supp. at 1298. Although the Court never reached an ultimate ruling, it concluded that the Tribes "adequately demonstrated probable suc-

---

**12.** This ruling is consistent with controlling Ninth Circuit authority. *See Kittitas Reclama-* *tion Dist. v. Sunnyside Valley Irrigation Dist.,* 763 F.2d 1032, 1034 n. 1 (9th Cir.1985).

cess on the merits as to [their] treaty rights." *Id.*

The Secretary of the Interior is charged with administration of the Flathead Irrigation Project. *See* 25 U.S.C. § 381, 25 C.F.R. § 171.1. Administration and appropriation of water rights between Indians and non-Indians have been a struggle for the government since the time of *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), when the doctrine of reserved water rights was created. Waters on the Flathead Indian Reservation have been in controversy since at least 1939, when the Ninth Circuit decided *United States v. McIntire,* 101 F.2d 650 (9th Cir.1939).

After tracing the development of settlement and irrigation on the Flathead Reservation, the court in *McIntire* held that successors in interest to lands of an Indian who had personally appropriated water for his own use acquired no valid right to the waters so appropriated. Because the United States held legal title to the land and waters of the Reservation for the benefit of the Indians, title to the waters could not be acquired by anyone except as specified by Congress. *McIntire,* 101 F.2d at 653. Therefore, the court held that the original Indian farmer through whom the claimants asserted their rights, obtained no valid water right. *Id.* The court was not confronted with the issue of whether the Secretary of the Interior acted erroneously because the case concerned application of state statutes and local custom. The court did, however, note the Secretary's statutory obligation to make "just and equal distribution" of the waters pursuant to 25 U.S.C. § 381. *Id.* at 654.

The Walker River Irrigation District in Nevada was also the subject of litigation in 1939. The Ninth Circuit held that the Indians of the Walker River Indian Reservation were entitled to an implied reservation of water to the extent reasonably necessary to supply their needs, and that the off-reservation settlers upstream were required to yield to the tribe's rights. *United States v. Walker River Irrigation Dist.,* 104 F.2d 334, 339 (9th Cir.1939). Rejecting the arguments of estoppel against the government, the court stated:

> The settlers who took up lands in the valleys of the stream were not justified in closing their eyes to the obvious necessities of the Indians already occupying the reservation below.

*Id.*

A related issue arose in *United States v. Powers,* 305 U.S. 527, 59 S.Ct. 344, 83 L.Ed. 330 (1939), in which waters of the Crow Indian Reservation were in dispute. The water in question was needed for cultivation of lands allotted to members of the tribe and subsequently sold to non-Indians and held in fee simple. Similar to the history of the Flathead Reservation, the Crow Reservation had been surveyed and divided for allotment. The landowners bringing suit had succeeded to the interest of the original allottees. Their patents contained no express provision of water rights. At the time the action was commenced, irrigation works were under construction on the Crow Reservation. Without considering "the extent or precise nature" of the landowners' water rights, the Court held that "when allotments of land were duly made for exclusive use and thereafter conveyed in fee, the right to use some portion of tribal waters essential for cultivation passed to the owners." *Powers,* 305 U.S. at 532, 59 S.Ct. at 346. Citing 25 U.S.C. § 381, the Court noted that the Secretary of the Interior, though authorized, had prescribed no rules or regulations to secure "just and equal distribution" of waters. Clearly, the court observed, Congress recognized "equal rights among resident Indians." *Id.* at 533, 59 S.Ct. at 347.

*Powers* ultimately became the foundation for the rule that an Indian allottee may sell his right to reserved water when he secures a transfer of his allotted land. *See Colville Confederated Tribes v. Walton, supra,* 647 F.2d at 50. In *United States v. Ahtanum Irrigation District,* 236 F.2d 321, 342 (9th Cir.1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957), the Ninth Circuit Court of Appeals held

that non-Indian purchasers of allotted lands are entitled to "participate rateably" [sic] with Indian allottees to the use of reserved water. The court found clear indication from *Powers* that the non-Indians did originally acquire a water right through purchase of allotments. *Id.*

In 1942, the Ninth Circuit refused to enjoin owners of certain Indian allotments from diverting water through privately constructed ditches. The court found no showing that the landowners "used an amount of water in excess of 'so much water as may be required to irrigate such lands.'" *United States v. Alexander*, 131 F.2d 359, 361 (9th Cir.1942). The court went on to state that assuming equal priority of water rights between allotted and unallotted lands (an issue which was not presented), "the general allotment act (25 U.S.C. § 381) requiring 'just and equal distribution' would be applicable here because of the insufficiency of the water supply." *Id.* The court noted that no regulations had been promulgated pursuant to that statute, and thus a violation thereof could not be shown. *Id.* The court refused to adjudicate the relative priorities of the water rights of allotted and unallotted lands, because of the absence of indispensable parties.

In a further expansion of non-Indians' rights to reservation waters, the court in *Scholder v. United States*, 428 F.2d 1123 (9th Cir.1970), held that the BIA was entitled to make expenditures on an Indian irrigation project which accrued to the exclusive benefit of a non-Indian landowner. The court stated that 25 U.S.C. § 13, which provides general authorization for the BIA to expend moneys, including costs for extension, improvement, operation and maintenance of Indian irrigation projects, does not require "that every individual irrigation expenditure be 'for the benefit, care and assistance of Indians.'" *Id.* The court's ruling was tempered by sharp criticism of the BIA's administration of the irrigation

project, noting that non-Indian construction requests had been fulfilled much more expediently than requests by tribal members. *Id.* at 1130.

A common thread running through the above cases is the age-old problem of competition for scarce water. Ordinarily, competing water interests must be resolved by water rights adjudication litigation. In a prior appropriations system, such as that used in most Western states, the outcome of water adjudication depends on the date of appropriation. In the Indian federal reserved rights context, of course, some differences arise. Clearly, however, where water rights have not been adjudicated, an alternative method must be developed for allocation of precious water resources.

Defendants admit that the irrigators own valid water rights, and indeed from a historical perspective, and in view of the case law cited above, it cannot be disputed that the non-Indian irrigators on the Flathead Reservation have rights to the waters, albeit unquantified. Equally clear is the existence of reserved water rights on behalf of the Tribes.[13]

Title 25, United States Code, section 381, provides in pertinent part as follows:

> In cases where the use of water for irrigation is necessary to render the lands within any Indian reservation available for agricultural purposes, the Secretary of the Interior is authorized to prescribe such rules and regulations as he may deem necessary to secure a just and equal distribution thereof among the Indians residing upon any such reservation....

As part of the General Allotment Act, section 381 was enacted in 1887, in the spirit of assimilation and promotion of an agrarian society among Indians. Section 385, 28 U.S.C., provides for establishment of maintenance charges, reimbursement of construction costs, and apportionment of costs. The Ninth Circuit has held that, although this chapter of Title 25 deals with "Indian

---

**13.** If the Tribes choose to use water reserved for irrigation in a non-consumptive manner, they do not thereby relinquish any of their water

rights to other appropriators. *United States v. Anderson*, 736 F.2d 1358, 1365 (9th Cir.1984).

allotments," it shows that Congress contemplated non-Indian use of Indian projects. *Scholder v. United States*, 428 F.2d at 1127. The court also noted that Indian irrigation projects have been sponsored and administered by the United States since the early 1900s, "and at all times the projects have served non-Indians as well as Indian lands within their boundaries." *Id.*

The Secretary of the Interior enacted no regulations under 25 U.S.C. § 381 until 1977. Operation and maintenance of Indian irrigation projects now are governed by part 171, Title 25, Code of Federal Regulations. Pertinent to this litigation is section 171.1(c), which provides as follows:

> (c) The Officer-in-Charge is responsible for performing such work and taking any action which in his judgment is necessary for the proper operation, maintenance and administration of the irrigation project or unit. In making such judgments, the Officer-in-Charge consults with water users and their representatives, and with tribal council representatives, and seeks advice on matters of program priorities and operational policies. The Officer-in-Charge will be guided by the basic requirement that the operation will be so administered as to provide the maximum possible benefits from the project's or unit's constructed facilities. The operations will insure safe, economical, beneficial, and equitable use of the water supply and optimum water conservation.

It is a well-known maxim that administrative agencies must comply with their own regulations. *Confederated Tribes and Bands of the Yakima Indian Nation v. F.E.R.C.*, 746 F.2d 466, 474 (9th Cir. 1984). The regulations define "Officer-in-Charge" as the agency Superintendent, Project Engineer or such official as authorized by the Area Director. 25 C.F.R. § 171.1(a).

In this case, FIP personnel received a directive on July 17, 1986, from Stanley Speaks, Portland Area Director of the BIA, that certain instream flows and pool levels were to be implemented. Speaks further directed that those flows and levels be monitored daily, and that a record be kept and provided to his office and to the Tribes on a weekly basis.

The origin of the BIA's involvement in setting interim instream flows is the 1985 stipulation between the government and the Tribes. By the terms of the stipulation, the BIA agreed

> to initiate discussions with the Tribes and other interested parties toward development of water conservation and management plans for FIP operations prior to September 17, 1985.

*Stipulation*, part VI, p. 9 (admitted as Plaintiff's Exhibit 1). In the Fall of 1985, the JBC received a letter from the Portland Area Office indicating the BIA's efforts to comply with the stipulation. The letter enclosed the first draft of the Bureau's Water Conservation and Management Plan, developed after discussions with the Tribes as to how the Bureau should proceed. A meeting was held on October 31, 1985, at which time the draft plan was discussed.

Over the course of the next several months, various correspondence was exchanged between the Project, the Bureau, and the JBC regarding establishment of interim instream flows. In its correspondence, the JBC consistently expressed a desire for involvement in the process. Most of the BIA correspondence consisted of proposals or advising the JBC of certain actions, and requesting comment. In a letter dated June 26, 1986, the JBC expressed concern that it was not being included in the decisionmaking process, but "merely asked to comment on a decision already made." (Plaintiff's Exhibit 8.)

The evidence shows that the studies which ultimately served as the basis for the Bureau's decision were conducted by Tribal and BIA technical personnel to the exclusion of the irrigators! The government submits that the JBC was given the opportunity to have its own staff participate, but did not retain anyone for this purpose until it was too late and the work already had

been completed. The record does not support this contention.

In reviewing the record, the Court is interested only in material relied upon by the Area Director in reaching his decision. *Burlington Truck Lines, supra,* 371 U.S. at 168–69, 83 S.Ct. at 245–46. The post hoc efforts of counsel, both by argument and evidence submitted at hearing, to rationalize the BIA's decision, are meaningless unless these factors were actually considered by the Bureau in reaching its decision. The record is nearly devoid of any explanation or indication of the factors or computation which the Area Director took into account in arriving at the figures used in the 1986 interim plan. *See Pyramid Lake Paiute Tribe v. Morton,* 354 F.Supp. at 256. The only item of evidence the Court is able to determine was conclusive in the Area Director's determination is the series of inflection points picked by Tribal and BIA personnel at a meeting from which the JBC was excluded.

The "critical meeting" which became the focus of the JBC's complaint occurred on June 27, 1986. The purpose of the meeting was to analyze data collected from the wetted perimeter studies and select "inflection points" from which to determine possible instream flow levels.[14] Initially, the JBC was invited to attend and participate in this meeting. *See* Plaintiff's Exhibit 7. Subsequently, the JBC was advised that it would not be allowed to attend the meeting pursuant to objections registered by the Tribes. The inflection points selected at that meeting were identical to the points utilized by the BIA in fixing the 1986 minimum flows.

The Tribes insist that it was entirely proper for the JBC to be excluded from the meeting, first, because only the "technical people" who participate in collecting data are competent to participate in selection of inflection points, and second, because the Tribes are entitled to confer with their fiduciary in the absence of their adversary.

The Tribes' first argument consists of somewhat circular reasoning. Essentially, the argument is that JBC personnel were not qualified to participate in analyzing the data because they had not participated in the field studies, even though the JBC learned of the field studies only two weeks before they were to commence. *See* Plaintiff's Exhibit 5.

The contention that the fiduciary relationship obligated the BIA to meet privately with the Tribes is specious. It is true that the BIA owes special duties to the Tribes. As administrator of a water project beset with controversy, however, the BIA acts in a dual capacity. This dual capacity has been addressed by the courts many times in the context of the government's role as trustee for the Indians as well as representative of other federal interests. *See White Mountain Apache Tribe v. Hodel,* 784 F.2d 921, 925 (9th Cir. 1986). Speaking to this subject, the United States Supreme Court observed:

> The United States undoubtedly owes a strong fiduciary duty to its Indian wards.... It may be that where only a relationship between the Government and the tribe is involved, the law respecting obligations between a trustee and a beneficiary in private litigation will in many, if not all, respects adequately describe the duty of the United States. But where Congress has imposed upon the United States, in addition to its duty to represent Indian tribes, a duty to obtain water rights for reclamation projects, ... the analogy of a faithless private fiduciary cannot be controlling for purposes of evaluating the authority for the United States to represent different interests.

*Nevada v. United States,* 463 U.S. 110, 142, 103 S.Ct. 2906, 2924, 77 L.Ed.2d 509 (1983).

The same reasoning is applicable here, for although the government is not serving as advocate for opposite sides of a contro-

---

**14.** Although the scientific methodology is receiving sketchy treatment in this opinion, I do not find it necessary to belabor the details, which are by and large immaterial to the decision herein.

versy, it is serving as advocate and judge. Thus, the exclusion of the JBC from one meeting may not be critical if it is a meeting between fiduciary and ward. Where, however, that meeting is between one party to a controversy and the judge of that controversy, the exclusion of the other party is a different matter. Here, because the only element in the record lending support to the BIA's decision is the series of figures selected at that one meeting, the conclusion is inescapable that the BIA relied exclusively on Tribal and BIA input in reaching its decision.

Having reached that determination, I must consider whether it was improper for the BIA to look only at Tribal demands in establishing instream flows and pool levels for the Project. Returning to the regulations promulgated by the Secretary of the Interior, the Court notes several affirmative obligations placed upon project administrators. Section 171.1(d) states in pertinent part:

> close cooperation between the Indian tribal councils, the project water users and the Officer-in-Charge is necessary and will be to the advantage of the entire project.

The regulations impose a duty upon project management to consult with water users and their representatives, and with tribal council representatives, and to seek advice on matters of program priorities and operational policies. 25 C.F.R. § 171.1(c). From the evidence adduced at hearing, and from the affidavits on file herein, the Court finds no indication that the Area Director or his agents consulted with the water users, and not even a suggestion that the interests and concerns of the water users were considered in the final outcome![15] From this glaring absence of a record upon which the Director's decision was based, I find that the JBC has sustained its burden of showing a likelihood that the BIA's decision was arbitrary and constituted an abuse of dis-

cretion. In the presence of a sufficient showing of irreparable injury, this warrants issuance of a preliminary injunction.

The problems facing the Flathead Reservation are not unique, but neither are they insurmountable. It is tragic that the system has operated for so many years under the conditions that appear to exist. A comparison of the 1928 study conducted by Porter J. Preston and Charles A. Engle with the 1985 study conducted by BIA and Bureau of Reclamation staff reveals a severe lack of attention to the Project over a sixty-year period.

The Preston-Engle Report recommended, for all Indian irrigation projects, that rules and regulations for project operation and maintenance be formulated and distributed; that cordial relations be promoted; that the formation of water users associations be encouraged and that the project management attend the meetings of such associations for discussion of problems and complaints; that a thorough investigation of water supply be conducted, following which all projects would be reduced to the acreage for which there is a safe and dependable water supply; and that water rights be established and protected. (71st Cong.2d Sess. pt. 6 at 2211–13.)

The authors of the Report recommended strongly that the *Winters* doctrine be invoked and enforced with respect to all those reservations where necessary to secure an adequate water supply for Indian lands. The *Winters* doctrine, it was stated, "is a measure of simple fairness and justice to the Indian, and is essential to his welfare." *Id.* at 2231. The authors did not recommend, however, that the government enforce *Winters* rights to the detriment of the non-Indian settlers:

> We believe, however, that in making practical application of this principle the Government and not the pioneers should stand whatever losses may result from

---

15. It is interesting to note that the government's emphasis on its fiduciary duty to the Indians in this case is contrary to its position in *Northern Cheyenne Tribe v. Hodel*, CV 82–116–BLG, when in support of his decision to issue coal leases the Secretary of the Interior argued that his duties and responsibilities extend to all United States citizens, and he was compelled to act in the "national interest." Slip op. at 29.

the Government's failure to properly protect the Indians in their water rights. In our judgment the Government owes a duty to the pioneers as well as to the Indian. *Id.* The Report recommended that where the application of *Winters* would result in loss of water rights regularly acquired by appropriation and beneficial use, the government should secure *Winters* rights either by purchase of valid rights or by the construction of storage reservoirs for the impounding of flood or surplus waters. "Any other course, in our opinion, would be penalizing the rights of private citizens for the failure of the Government to properly protect the Indian in his water rights." *Id.* at 2213.

The Preston-Engle Report also suggested that the Flathead Irrigation Project be transferred to the Bureau of Reclamation, which had a larger and better trained staff for administering water projects. *Id.* at 2257–60. This suggestion was mentioned nearly 60 years later in the *Comprehensive Review* study. The authors reached a different conclusion, however, recommending that management of the irrigation division be transferred to the water users themselves, and that administration of the power division be transferred to the Tribes.

The *Comprehensive Review* reflects many of the problems expressed by the parties to this litigation. The authors found a "serious lack of communication and coordination" between the Project, the Tribes, the JBC and the Flathead Agency. *Id.* at 1–9. They observed that such interaction is essential for efficient operation and resolution of controversial issues. The *Review* also noted racial and political tension on the Reservation and differences of opinion with respect to transfer of Project management.

Included in the study was an extensive engineering report, which concluded that FIP irrigation facilities are in a deteriorated condition, such that, without rehabilitation, portions of the system will soon stop functioning. *Comprehensive Review* at 1–8, 1–31. The Engineering Committee

"guessed" that dam rehabilitation costs would be in the neighborhood of 55 million to 80 million dollars. *Id.* at 1–36.

From a historical as well as current perspective, it is evident that FIP is facing serious challenges. The Bureau of Indian Affairs must be cognizant of these challenges and do everything in its power to ameliorate the difficulties. The 1985 *Comprehensive Review* was available at the time the Bureau was making its determinations with respect to 1986 interim flows. Yet the BIA appears not to have proceeded cautiously and conscientiously in making those determinations.

## CONCLUSION

The effect of the Court's order in 1985 was to advise the Secretary that he would not be permitted to suck dry the streams of the Flathead Reservation in derogation of tribal treaty rights. Here I conclude that neither shall the BIA be allowed to seriously injure 2,600 irrigators by totally disregarding their rights. The actions of the Secretary are legally wrong—if not inexcusable.

The Court is not so much concerned with the Bureau's ultimate specific decisions pertaining to administration of the Flathead Irrigation Project, as I am interested in the manner in which such decisions are reached. "Just and equal distribution" is a guiding principle for Project management. This principle applies to *all* waters of the Reservation. It does not require distribution of an equal quantity of water to every claimant, but it does require that the manner of distribution be fair.

There is a high duty and a heavy burden on the BIA under present circumstances to exercise sound judgment and to fairly administer this water project. The BIA should use this opinion and the 1985 decision as parameters, and should reach a fair middle ground in allocating these water resources until such time as the State of Montana adjudicates the respective priorities of the competing rights of the parties.

Difficult as this process [may] be, and troublesome as the repercussions of his

actions might be, the Secretary [is] required to resolve the conflicting claims in a precise manner that [will] indicate the weight given each interest before him. *Pyramid Lake Paiute Tribe v. Morton*, 354 F.Supp. at 256–57. The parties would help themselves by striving to reach a negotiated agreement with the state Water Rights Compact Commission and by encouraging the expeditious resolution of the water rights adjudication process. Until then, the Bureau is responsible for fair and equitable administration of the irrigation system, and is encouraged to apply common sense and careful deliberation in its decisions.

## ORDER

Based upon the foregoing opinion,

IT IS HEREBY ORDERED that the Plaintiff's motion for preliminary injunction is GRANTED. During the pendency of this case, and until further order of this Court, the Bureau of Indian Affairs, United States Department of the Interior is enjoined from implementing the 1986 Interim Instream Flow and Pool Level Agreement or any other such plan which fails to consider the rights of any interested party.