832 F.2d 1127
 JOINT BOARD OF CONTROL OF the FLATHEAD, MISSION AND JOCKO
IRRIGATION DISTRICTS, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant,
and
Confederated Salish and Kootenai Tribes of the Flathead
Reservation, Defendant- intervenor-Appellent.
 No. 86-4317.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 5, 1987.
Decided Nov. 17, 1987.
 
 J. Daniel Hoven and Stanley T. Kaleczyc, Helena, Mont., for the Joint Bd. of Control of the Flathead, Mission and Jocko Irr. Districts.
 Daniel E. Decker and John B. Carter, Pablo, Mont., and James H. Goetz, Bozeman, Mont., for the Confederated Salish and Kootenai Tribes.
 Appeal from the United States District Court for the District of Montana.
 Before CANBY, REINHARDT and BEEZER, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 The Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts (the Joint Board) brought suit to enjoin the Bureau of Indian Affairs (the BIA) from continuing to implement its 1986 operating strategy for the Flathead Irrigation Project in Montana. The District Court granted the preliminary injunction and the Confederated Salish and Kootenai Tribes of the Flathead Reservation (the Tribes) appealed. We review the District Court's grant of injunctive relief pursuant to 28 U.S.C. Sec. 1292(a)(1). We reverse.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 This case involves a continuing dispute surrounding the operating strategy by which the BIA provides water supplies controlled by the Flathead Irrigation Project to serve the competing demands of tribal fisheries and irrigated agriculture. The first litigation was commenced by the Tribe. In 1985, the Tribes determined that drought conditions--a combined effect of diminished precipitation and high summer temperatures--would diminish flows and decrease water levels in the Reservation's rivers and reservoirs. They brought an action to enjoin the BIA from distributing waters to the irrigation districts in such a manner as to deplete the streams and reservoirs and cause what the Tribes viewed as irreparable damage to the tribal fisheries. The Joint Board intervened. According to the Tribes, the BIA's efforts to meet the demands of irrigated agriculture at the expense of tribal fisheries violated the Tribe's fishing rights secured by the Treaty of Hell Gate, 12 Stat. 975 (1859), and the Tribe's implied reserved water rights. See Winters v. United States, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The district court issued a temporary restraining order. The parties then entered a stipulation that established minimum stream flows and reservoir water levels for the 1985 irrigation season and set forth procedures for establishing future minimum flows and water levels. The District Court consequently dismissed the action as moot. Confederated Salish and Kootenai Tribes of Flathead Reservation v. Flathead Irrigation and Power Project, 616 F.Supp. 1292 (D.Mont.1985).
 
 
 3
 By the summer of 1986, the BIA had established an interim operating strategy that provided greater protection for tribal fisheries by ensuring minimum stream flows and minimum reservoir levels. In some instances, implementation of these flow requirements diminished the availability of irrigation water. On August 4, 1986, the Joint Board brought this suit for injunctive relief against the United States, claiming that the BIA had abused its discretion in establishing the 1986 Interim Instream Flow and Pool Level Agreement.[1] The Tribes intervened. According to the Joint Board, the BIA had abused its discretion by failing to give consideration to the rights and interests of the irrigators in determining a water distribution strategy, and by inequitably distributing the water supplies of the Flathead Irrigation Project.
 
 
 4
 The District Court issued a temporary restraining order and then held a hearing on whether to issue a preliminary injunction. Subsequent to the hearing, the district court found that the Joint Board had "shown substantial likelihood of success on the merits and a possibility of irreparable injury" and granted the preliminary injunction. The Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts v. United States, 646 F.Supp. 410, 416 (D.Mont.1986).
 
 
 5
 In addition to enjoining the BIA from continuing to implement the 1986 Interim Instream Flow and Pool Level Agreement, the District Court set forth legal principles for allocating the scarce water supplies of the Project. The District Court viewed the different positions taken by the BIA in 1985 and in 1986 as extreme, polar positions--first protecting the irrigators at the expense of the Tribes and, second, protecting the Tribes at the expense of the irrigators. The District Court counseled that the BIA must be guided by the principle of "just and equal distribution" of "all waters of the Reservation." Joint Board of Control, 646 F.Supp. at 426.
 
 DISCUSSION
 I. Article III Justiciability
 
 6
 Before we can reach the merits of the appeal, we must determine whether this case is moot. A live case or controversy within the meaning of Article III of the Constitution may exist even after the challenged activity, in this case the 1986 Interim Agreement, has ceased, if the action is "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); see, e.g., Lee v. Schmidt-Wenzel, 766 F.2d 1387 (9th Cir.1985). This exception to the mootness doctrine is applicable to cases where: "(1) the challenged action is of limited duration, too short to be fully litigated prior to its cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." Wiggins v. Rushen, 760 F.2d 1009, 1011 (9th Cir.1985). This controversy clearly meets the first requirement. Operating strategy for each irrigation season has such a short life that it cannot effectively be subjected to appellate review. The second requirement is also satisfied; the challenged activity is likely to recur. The same parties were before the district court as a result of the BIA's operating strategy in 1985 and 1986. Subsequent to the filing of the action challenging the 1986 Interim Agreement, the parties were again before the district court challenging the 1987 operating strategy. This controversy has recurred and will continue to recur.
 
 
 7
 Moreover there is a continuing public interest in determining the appropriate legal principles by which the BIA should distribute water, which transcends the particular distribution strategy selected in any given year. See United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). We conclude that this case is not moot.
 
 II. Standard of of Review
 
 8
 We ordinarily review a district court's decision to issue a preliminary injunction for an abuse of discretion. Oakland Tribune, Inc. v. Chronicle Publishing Co., 762 F.2d 1374, 1376 (9th Cir.1985). A district court abuses its discretion if it employs erroneous legal standards in issuing or denying the injunction, or bases its decision upon erroneous legal premises, Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1200 (9th Cir.1980). Whether a legal standard or premise is erroneous is a question of law that we review de novo. See Douglas v. Beneficial Finance Co., 469 F.2d 453, 454 (1972).
 
 III. The Merits of the Injunction
 
 9
 In order to determine the proper allocation of water in short supply, the relative priorities of the water rights of the claimants are obviously of great relevance. In determining to issue the preliminary injunction, however, the district court made it very clear that it had "no intention of adjudicating water rights." 646 F.Supp. at 415, 417. The sources of the district court's reluctance are not hard to find. There is a clear federal policy to permit general water rights adjudications to be performed in state courts. Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Federal actions brought for the purpose of determining the priority of water rights will generally be dismissed in favor of concurrent state court proceedings. See e.g., Arizona v. San Carlos Apache Tribe of Arizona, 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983). At the time of the district court's decision, the State of Montana was in the process of determining water rights within the state,[2] an undertaking expected to consume many years.
 
 
 10
 In the meantime, however, controversies like the present one arise and must be decided. See Kittitas Reclamation District v. Sunnyside Valley Irrigation District, 763 F.2d 1032 (9th Cir.1985), cert. denied, 474 U.S. 1032, 106 S.Ct. 593, 88 L.Ed.2d 573 (1985). The district court recognized that fact in ruling that it would not defer decision in favor of a state water rights adjudication that might not reach the Flathead Reservation until 1990. Joint Board, 646 F.Supp. at 414-15. Yet the district court undertook to decide the controversy, for purposes of preliminary injunction, while blinding itself to the possible priorities of water rights among the litigants. That position is not tenable.
 
 
 11
 The district court held that the principle that must guide the BIA in allocating all of the waters of the reservation was a "just and equal distribution." 646 F.Supp. at 426. Inherent in that conclusion, however, is an assumption concerning the priorities of the water rights of the competing claimants. The requirement of "just and equal distribution" is derived from a section of the Dawes Act, 25 U.S.C. Sec. 381, which authorizes the Secretary of Interior to make regulations for the allocation of irrigation water within Indian reservations. It presumes that all of those who seek irrigation water stand on the same footing, in which case "just and equal distribution" is appropriate. See United States v. Alexander, 131 F.2d 359, 361 (9th Cir.1942). A similar assumption underlies the Secretary's regulation calling for "close cooperation" between the Indian and other project users. 25 C.F.R. Sec. 171.1(d).[3] Thus, if all of the parties had derived their rights from the same reserved source, and all shared the same priority date, then it would be appropriate to decree an equitable sharing of the shortfall during times of drought. Colville Confederated Tribes v. Walton, 752 F.2d 397, 405 (9th Cir.1985), cert. denied, 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). That, however, is not the situation presented by this case.
 
 
 12
 The action of the BIA that was attacked and enjoined in the district court was the establishment of minimum stream flow and pool levels to preserve the tribal fisheries. The Treaty of Hell Gate provided:
 
 
 13
 The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians....
 
 
 14
 12 Stat. at 976. In United States v. Adair, 723 F.2d 1394 (9th Cir.1983), cert. denied, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984), we held that similar language, accompanied by a history indicating that one of the essential purposes in creating the reservation was to preserve the Indians' right to fish, created a reserved water right in the Tribe. Id. at 1408-11. Moreover, when the Tribe exercised aboriginal title and rights to fish on the lands and waters in question before the reservation was created, the priority date of the reserved water right for fishery purposes is time immemorial. Id. at 1412-15.
 
 
 15
 The Tribes in this case contended that they had exercised aboriginal fishing rights over the territory and waters in issue. The district court did not permit the Tribes to make a record on that point. Yet their claim is clearly a colorable one; we have stated elsewhere that one of the Tribes was heavily dependent on fishing the area when the Treaty of Hell Gate was signed. Confederated Salish & Kootenai Tribes v. Namen, 665 F.2d 951, 962 (9th Cir.1982), cert. denied, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982). To the extent that the Tribes here did exercise aboriginal fishing rights, the treaty language clearly preserved those rights, and the water needed for them. Adair, 723 F.2d at 1412-15. The priority date of time immemorial obviously predates all competing rights asserted by the Joint Board for the irrigators in this case. Once a court takes jurisdiction to resolve a water rights dispute, it has "a solemn obligation to follow federal law" that governs Indian water rights. San Carlos Apache Tribe, 463 U.S. at 571, 103 S.Ct. at 3216. It was error, therefore, for the district court to hold that water claimed under potentially prior tribal fishing rights must be shared with junior appropriators, and that the requirement of equitable sharing could be imposed without addressing the Tribes' claim of aboriginal fishing water rights.
 
 
 16
 At oral argument, the Joint Board contended that the law would not permit the tribal fisheries to be protected in full if the result was to deprive a much larger number of farmers of the water needed for irrigation. This contention ignores one of the fundamental principles of the appropriative system of water rights. See e.g., Morris v. Bean, 146 F. 423 (C.C.D.Mont.1906) (Montana water law requires that senior rights be fully protected, even though more economic uses could be made by junior appropriators). "Where reserved rights are properly implied, they arise without regard to equities that may favor competing water users." Walton, 752 F.2d at 405 (citing Cappaert v. United States, 426 U.S. 128, 138-39, 96 S.Ct. 2062, 2069-70, 48 L.Ed.2d 523 (1976)). To the extent that the Tribes enjoy treaty-protected aboriginal fishing rights, they can "prevent other appropriators from depleting the streams (sic) waters below a protected level." Adair, 723 F.2d at 1411; see Montana v. Confederated Salish and Kootenai Tribes, 712 P.2d 754, 764 (Mont.1985).
 
 
 17
 Part of the district court's rationale in enjoining the BIA from carrying out its operating strategy was that the BIA acted arbitrarily in establishing minimum stream flows and water levels for the Indian fishery without the participation of the Joint Board. Here again, however, the asserted right of the Joint Board to participate was based upon the requirements of "just and equal distribution" of the Dawes Act, 25 U.S.C. Sec. 381, and the regulation requiring "close cooperation" between Indian and other water project users, 25 C.F.R. Sec. 171.1(d). As we have already pointed out, those provisions impose duties upon the BIA in managing the Project's irrigation water in fairness to all irrigators; they do not deal at all with the BIA's duty in helping the Tribes to protect their prior and paramount fishing water rights. While the Joint Board and junior appropriators are free to contest by legal means the Tribes' and the BIA's quantification of the Tribe's fishing water rights, the Joint Board has produced, and we find, no authority that guarantees it a right to participate in the process by which the BIA and the Tribes initially establish that quantification.
 
 CONCLUSION
 
 18
 The reluctance of the district court to render a final adjudication of water rights in the Flathead Irrigation District is quite understandable. We do not suggest that the court is required to make any such general adjudication or quantification in the course of these proceedings. But the preliminary injunction under review, and the principle established for future irrigation years by the district court's opinion, fail to accord potentially superior tribal fishing rights the protection that federal law gives them against claims and considerations of junior appropriators.
 
 
 19
 The action of the BIA in establishing stream flow and pool levels necessary to protect tribal fisheries is not unreviewable. In making its determination, however, the BIA is acting as trustee for the Tribes. Because any aboriginal fishing rights secured by treaty are prior to all irrigation rights, neither the BIA nor the Tribes are subject to a duty of fair and equal distribution of reserved fishery waters. Only after fishery waters are protected does the BIA, acting as Officer-in-Charge of the irrigation project, have a duty to distribute fairly and equitably the remaining waters among irrigators of equal priority.
 
 
 20
 The order of the district court granting the motion for preliminary injunction is reversed, and the preliminary injunction is vacated. The case is remanded for such further proceedings as may be appropriate and consistent with this opinion.
 
 
 21
 REVERSED, PRELIMINARY INJUNCTION VACATED, CASE REMANDED.
 
 
 
 [1]
 The Interim Instream Flow and Pool Level Agreement was not an agreement at all. The "agreement" never received the approval of either the Tribe or the Joint Board of Control. Nevertheless, it was the strategy by which the BIA operated the Flathead Irrigation Project during the 1986 irrigation season
 
 
 [2]
 See Act to Adjudicate Claims of Existing Water Rights in Montana, Ch. 697, 1979 Laws of Montana 1901, described in San Carlos Apache Tribe, 463 U.S. at 554, 103 S.Ct. at 3207
 
 
 [3]
 The Tribes contend that 25 C.F.R. Sec. 171 was not enacted pursuant to 25 U.S.C. Sec. 381. In light of our disposition, we need not address that question