**ROCKWELL INTERNATIONAL CORPORATION, Appellant,**

v.

**U.S. DEPARTMENT OF JUSTICE, Appellee.**

No. 99–5218.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 25, 2000.

Decided Jan. 5, 2001.

John Townsend Rich argued the cause for appellant. With him on the briefs were David B. Beers and Brita Dagmar Strandberg.

Michael C. Johnson, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Responding to congressional criticism, the Department of Justice prepared an internal report defending its prosecution of appellant for environmental crimes allegedly committed at the Rocky Flats nuclear facility. Although the Department released the text of the report to the public, it withheld a series of supporting documents, mostly inter- and intra-agency memoranda written by Department lawyers. Relying on Exemption 5 of the Freedom of Information Act, which protects certain inter- and intra-agency memoranda from disclosure, the Justice Department rejected appellant's request to release the attachments. Appellant sued to compel disclosure, and the district court granted summary judgment for the Department. We affirm.

I

During the Cold War, the Rocky Flats nuclear weapons plant, located near Denver, Colorado, was responsible, along with other government facilities, for developing, producing, and testing America's nuclear weapons. Rocky Flats' particular task was to manufacture plutonium triggers, or "pits." U.S. DEP'T OF ENERGY, ROCKY FLATS CLOSURE PROJECT MANAGEMENT PLAN 3 (1998).

For almost 15 years, from 1975 until 1989, appellant Rockwell International Corporation operated Rocky Flats under a contract with the Department of Energy. In the late 1980s, the Justice Department began investigating Rockwell for possible criminal violations of environmental laws in connection with its activities at Rocky Flats. The Denver U.S. Attorney conducted the investigation with oversight from "Main Justice" in Washington. In 1992, after lengthy negotiations, Rockwell pled guilty to several violations and paid an $18.5 million fine. As part of the plea, the Justice Department agreed not to prosecute Rockwell employees, and the EPA and Colorado Department of Health agreed not to seek additional penalties based on conduct known to the government at the time of the plea.

Later that year, responding to public criticism of the plea agreement, the Investigations and Oversight Subcommittee of the House Committee on Science, Space and Technology, chaired by Representative Howard Wolpe, began an investigation of the Rocky Flats prosecution. Although the Department initially refused to give the Subcommittee any materials relating to its internal deliberative processes, it eventually allowed it to examine privileged documents on the express condition that they not be made public. In response to another committee request, four attorneys involved in the prosecution testified, but on instructions from the Justice Department refused to answer questions concerning the Department's internal deliberations. The Subcommittee threatened contempt proceedings against the attorneys unless President Bush formally invoked executive privilege on their behalf. Rather than ask the President to invoke the privilege, the Department allowed the attorneys to testify in closed recorded sessions before Subcommittee staff.

Following its investigation, the Subcommittee released a 144–page report criticizing the Justice Department for its "extreme conservatism" in pursuing the Rocky Flats prosecution. Known as the "Wolpe Report," it criticized the plea agreement for immunizing Rockwell employees from future prosecution, for the amount of the fine paid by Rockwell, and for the "global nature" of the settlement— the fact that the agreement prohibited both the Colorado Department of Health and the EPA from later prosecuting Rockwell.

Taking sharp issue with the Wolpe Report, the Justice Department charged that it was "misleading, incomplete, and full of inaccuracies." The Department also accused the Subcommittee of violating the confidentiality agreement by quoting extensively from the closed session inter-

views with department officials and from the internal memoranda the Department had furnished. Claiming that the Subcommittee distorted the record by quoting selectively from and misquoting these materials, the Department authorized full disclosure of the transcripts of the closed interviews "so that the excerpts selectively released by the Subcommittee can be put in context." Letter from Kevin P. Holsclaw, Acting Assistant Attorney General, to Hon. George Brown, Jr., Chairman, House Committee on Science, Space and Technology (Jan. 7, 1993).

Also in response to the Wolpe Report, the Associate Attorney General ordered an internal investigation of the Rocky Flats prosecution. Completed in April of 1994, the investigators' report—we will refer to it throughout this opinion as the "Report"—systematically rebutted each charge leveled by the Wolpe Subcommittee, concluding that "no basis existed for [its] sweeping criticisms." In a separate statement, the Attorney General expressed her hope that the Report would "put this matter to rest." Statement of the Attorney General Concerning the Internal Report on the Rocky Flats Prosecution (April 21, 1994).

Planting the seeds of this litigation, the Report referred to, cited, and quoted from a set of attachments. These included public documents relating to the plea negotiations; formal and informal Justice Department memoranda—some circulated within the Denver U.S. Attorney's office and others sent between Denver and Main Justice—discussing and evaluating the strengths and weaknesses of possible plea negotiation strategies; memoranda summarizing discussions within the Department and between Justice, EPA, and Rockwell; draft letters from the Department to Rockwell regarding the negotiations; and formal and informal communications between the Department and EPA. These attachments were excluded from the version of the Report released to the public.

Rockwell filed a FOIA request for the attachments. In response, the Justice Department released 226 pages of materials, but withheld an additional 386—mostly internal documents and inter-agency communications between Justice and EPA. In doing so, the Department relied on FOIA Exemption 5, which provides that the statute "does not apply to ... inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "Courts have construed this exemption to encompass the protections traditionally afforded certain documents pursuant to evidentiary privileges in the civil discovery context, including materials which would be protected under the attorney-client privilege, the attorney work-product privilege, or the executive deliberative process privilege." *Formaldehyde Inst. v. Dep't of Health and Human Services*, 889 F.2d 1118, 1121 (D.C.Cir.1989) (internal citations and quotations omitted).

Seeking to compel the Justice Department to disclose the attachments, Rockwell filed suit in the United States District Court here, making three basic arguments: (1) because the Department had extensively cited and quoted from the attachments, it had incorporated them into the Report, and was thus required to disclose them along with the Report under FOIA section 552(a)(2)(A), which requires disclosure of agency final opinions; (2) by disclosing the attachments to Congress, the Department waived their Exemption 5 protection; (3) by quoting from the attachments, describing their contents, and relying on them to vindicate its handling of the Rocky Flats prosecution, the Department waived its litigation privileges for the documents and thus their protection under Exemption 5. The district court rejected all of Rockwell's arguments and entered summary judgment for the government, finding (1) that because the Report could stand alone without its supporting documents, Justice had not incorporated the attachments into the

Report; (2) that disclosure to Congress did not waive Exemption 5 protection for the attachments; and (3) that the Department did not waive the attorney-client, deliberative process, or work-product privileges with respect to the attachments. Re-asserting the same basic arguments, Rockwell now appeals. Our review is *de novo*. *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 889 (D.C.Cir. 1995).

## II

In addition to its general requirement of disclosure, FOIA directs agencies to index and make available for inspection and copying "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases...." 5 U.S.C. 552(a)(2)(A). In *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 148, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975), the Supreme Court held that this provision trumps Exemption 5: parties must disclose all documents that are agency final opinions, even if they are inter- or intra-agency memoranda. The Court also held that "if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5." *Id.* at 161, 95 S.Ct. 1504 (italics omitted).

■ Relying on *Sears*, Rockwell argues that Exemption 5 does not protect the attachments because they were incorporated by reference into the Report, which, it claims, is an agency final opinion. The Department responds that the Report is not a final opinion subject to disclosure under section 552(a)(2)(A) and *Sears*. Incorporation, it argues, is therefore irrelevant.

*Sears* provides general principles for determining whether an agency document qualifies as a final opinion. At issue in *Sears* were Advice and Appeals Memoranda that the NLRB General Counsel sent to regional directors explaining his decisions not to pursue particular unfair labor practice charges. *Id.* at 135–36, 95 S.Ct. 1504. Pointing out that under the National Labor Relations Act only the General Counsel could file such complaints, and that the decision not to do so was unappealable, the Court stated:

> The decision to dismiss a charge is a decision in a "case" and constitutes an "adjudication": an "adjudication" is defined under the Administrative Procedure Act, of which [FOIA] is a part, as "agency process for the formulation of an order"; an "order" is defined as "the whole or part of a final disposition, whether affirmative [or] negative ... of an agency in a matter"; and the dismissal of a charge ... is a "final disposition." Since an Advice or Appeals Memorandum explains the reasons for the "final disposition" it plainly qualifies as an "opinion"; and falls within 5 U.S.C. 552(a)(2)(A).

*Id.* at 158–59, 95 S.Ct. 1504 (internal citations and emphasis omitted). Interpreting this holding in *Bristol-Meyers Co. v. FTC*, 598 F.2d 18 (D.C.Cir.1978), we said: "It appears to us that the Court meant in *Sears* to establish as a general principle that action taken by the responsible decisionmaker in an agency's decision-making process which has the practical effect of disposing of a matter before the agency is 'final' for purposes of FOIA. If such action is accompanied by a written explanation of the decisionmaker's reasoning, that explanation constitutes a 'final opinion' and must be disclosed." *Id.* at 25.

Invoking *Sears* and *Bristol-Meyers*, Rockwell claims that the Report qualifies as a final opinion because it sets out the Justice Department's final assessment of the propriety of the Rocky Flats prosecution—i.e., its conclusion that the prosecutors had not abused their discretion—and explains its decision to take no further action in regard to Rocky Flats. Pointing

out that the Attorney General has undisputed statutory authority to discipline subordinates and to investigate the handling of prosecutions by the Department, and quoting her statement that the Report should "put this matter to rest," Rockwell contends that the Report represents the final reasoning behind the Attorney General's "unreviewable rejection of the Wolpe Report's detailed charges of prosecutorial mishandling." Appellant's Reply Br. at 4.

We confronted a similar claim in *Common Cause v. IRS*, 646 F.2d 656, 659–60 (D.C.Cir.1981), where the appellant sought disclosure of an internal memorandum explaining the IRS's decision not to adopt a policy requiring public disclosure of contacts between high-ranking federal officials and the IRS. The memorandum, we decided, was not a final opinion because the case involved the "voluntary suggestion, evaluation, and rejection of a proposed policy by an agency, not the agency's final, unappealable decision not to pursue a judicial remedy in an adversarial dispute, as was present in *Sears*." *Id.* at 659.

The Report at issue in this case likewise sets forth the conclusions of a voluntarily undertaken internal agency investigation, not a conclusion about agency action (or inaction) in an adversarial dispute with another party. To be sure, the Attorney General has statutory authority to investigate the official acts of U.S. Attorneys, but Rockwell nowhere suggests that the Attorney General had any statutory duty to respond to the charges in the Wolpe Report. *See* 28 U.S.C. § 526(a)(1) (the Attorney General "*may* investigate the official acts ... of the United States attorneys....") (emphasis added). And far from explaining a decision not to pursue a judicial remedy, the Report simply rejects as a factual matter the Congressional charges of prosecutorial misconduct—charges not put forward in any formal agency or judicial proceeding. Of course, it is possible that had the Attorney General found evidence of abuse of prosecutorial discretion, she might have brought formal

charges. But the Report nowhere contemplated, evaluated, or rejected specific disciplinary action against any Justice Department employee.

Acknowledging that there were "no formal agency adjudicatory proceedings on the handling of the Rocky Flats prosecution," Appellant's Reply Br. at 2, Rockwell claims that the same was true in *Niemeier v. Watergate Special Prosecution Force*, 565 F.2d 967 (7th Cir.1977). There the Seventh Circuit concluded that a final report issued by the Watergate Special Prosecutor explaining his decision not to prosecute former President Nixon was a final opinion for purposes of FOIA, even though the prosecutor had neither initiated a prosecution nor sought an indictment. *Id.* at 971–72. The special prosecutor, however, had a statutory duty to issue a final report. In sharp contrast to this case, moreover, his decision amounted to a "final, unappealable decision not to pursue a judicial remedy in an adversarial dispute," *Common Cause*, 646 F.2d at 659–60—the dispute between the United States and the former president.

Because the propriety of the Rocky Flats prosecution was the subject of neither a "case" nor an "adjudication," we conclude that the Report does not qualify as a final opinion that the Department must disclose under section 552(a)(2)(A) and *Sears*. We thus agree with the Justice Department that we need not reach Rockwell's incorporation arguments.

### III

■ Rockwell next argues that the Justice Department waived Exemption 5 protection for all but three of the attachments by sending them to Congress. In support of this argument, Rockwell relies on *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 573–75 (D.C.Cir.1990), where we held that Exemption 5 did not protect a letter the Justice Department had sent to the House Ethics Committee. The letter summarized the results of a Justice Department probe into alleged wrongdoing by a

member of Congress, explaining that while the Department would be unable to prosecute the representative for violating any criminal laws, the Committee might want to consider whether his behavior violated House standards of conduct. Observing that Exemption 5 protects only inter- or intra-agency memoranda, and that Congress was not an "agency" within the meaning of the statute, *id.* at 574, we concluded that the letter was not covered by Exemption 5. In reaching this conclusion, we acknowledged that communications between an agency and Congress would receive protection as intra-agency memoranda if they were "part and parcel of the agency's deliberative process," as in the case of questionnaires sent from the Justice Department to members of the Senate. *Id.* at 575 (emphasis omitted). In *Dow Jones,* however, the Department sent the letter to Congress after concluding its own investigation; in fact, it wrote the letter for the sole purpose of assisting the Committee with its deliberations.

Rockwell argues that since the attachments to the Report were sent to assist the Wolpe Subcommittee in its deliberations, they no longer enjoy Exemption 5 protection. The district court rejected this argument, as do we. Unlike the letter in *Dow Jones,* the attachments are not documents created specifically to assist Congress, but rather memoranda and correspondence created as part of the Justice Department's deliberative processes—precisely the kind of inter- and intra-agency memoranda Exemption 5 protects. This case is thus controlled not by *Dow Jones,* but by *Murphy v. Dep't of the Army,* 613 F.2d 1151, 1155–59 (D.C.Cir.1979), where we held that the Army had not waived Exemption 5 protection for an internal legal memorandum by sending it to a congressman along with a letter. We relied mostly on FOIA section 552(d) (at the time codified at section 552(c)), which provides: "This section is not authority to withhold information from Congress." If "disclosure of information to Congress [were] disclosure to the whole world," we ob-

served, it would be "inconsistent with the obvious purpose of the Congress [in 552(d)] to carve out for itself a special right of access to privileged information," and would "effectively transform section [552(d)] into a congressional declassification scheme, a result supported neither by the legislative history of the Act, nor by general legal principles or common sense." 613 F.2d at 1155–56 (footnotes omitted). As a policy matter, moreover, "since under such an interpretation every disclosure to Congress would be tantamount to a waiver of all privileges and exemptions, executive agencies would inevitably become more cautious in furnishing sensitive information to the legislative branch—a development at odds with public policy which encourages broad congressional access to governmental information." *Id.* at 1156 (footnote omitted).

These considerations apply with even greater force in this case. In *Murphy,* we granted Exemption 5 protection to the memorandum despite the fact that the Army had made "[n]o specific request" and the congressman no specific promise to keep the document confidential. *Id.* at 1158–59. Here, the Justice Department gave the documents to the Subcommittee only after the Subcommittee expressly agreed not to make them public. Thus, far from intending to waive the attachments' confidentiality, the Justice Department attempted to preserve it. Under these circumstances, we find no Exemption 5 waiver.

## IV

■ This brings us to Rockwell's argument that by relying on and selectively quoting from several attachments, the Justice Department waived protection for all of them under the attorney work-product privilege, and thus under Exemption 5. The attorney work-product privilege protects "the files and the mental impressions of an attorney ... reflected, of course, in interviews, statements, memoranda, corre-

spondence, briefs ..., and countless other tangible and intangible ways." *Hickman v. Taylor*, 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947). "The purpose of the privilege, however, is not to protect any interest of the attorney ... but to protect the adversary trial process itself. It is believed that the integrity of our system would suffer if adversaries were entitled to probe each other's thoughts and plans concerning the case." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 864 (D.C.Cir.1980). Here, the Department claims that the withheld attachments are just the kinds of "memoranda" and "correspondence" containing its "thoughts and plans" about the Rocky Flats prosecution that warrant work-product privilege protection.

■ Rockwell does not dispute the Department's claim that the work-product privilege covers all withheld attachments. Instead, it argues that the Justice Department waived the privilege in two ways. First, it claims that the Department took "many actions inconsistent with maintaining the confidentiality of its work-product," such as "provid[ing] its work-product to Congress, request[ing] that the transcript of staff interviews before the Wolpe Subcommittee be made public, and publish[ing] portions of its work-product in its Report." Appellant's Reply Br. at 10 (internal citations omitted). It is true that although the "mere showing of a voluntary disclosure to a third person ... should not suffice in itself for waiver of the work-product privilege," disclosure of work-product materials can waive the privilege for those materials if "such disclosure, under the circumstances, is inconsistent with the maintenance of secrecy from the disclosing party's adversary." *United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C.Cir.1980) (internal citation, quotation, and emphasis omitted). In our view, however, none of the Department's actions was inconsistent with keeping the documents secret. We have already explained that disclosure to Congress did not

waive Exemption 5 protection. As to the transcripts of the staff interviews, the Department requested that they be released only after the Wolpe Report quoted from them selectively. Nor do we see how quoting portions of some attachments is inconsistent with a desire to keep the rest secret, particularly in view of the steps the Department took to maintain their confidentiality, such as securing a promise of confidentiality from the Subcommittee and withholding the attachments when releasing the Report. *Cf. In re Sealed Case*, 676 F.2d 793, 818 (D.C.Cir.1982) ("The purposes of the work product privilege are more complex, and they are not inconsistent with selective disclosure—even in some circumstances to an adversary.").

■ Rockwell's second and primary argument is that by making "testimonial use" of the attachments—by relying on them in the Report to "put ... to rest" criticisms of the Rocky Flats prosecution—the Department "waive[d] the privilege with respect to work-product related to the same subject matter." Appellant's Reply Br. at 10; *see also* Appellant's Br. at 29. For this proposition, the company cites three cases, the first being *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). There, the defense sought to call an investigator to testify about interviews he had conducted with witnesses to a crime, but at the same time to withhold his written report of the interviews under the work-product privilege. The Supreme Court agreed with the trial court that the defense could not invoke the privilege, and that in line with normal trial practice it would have to provide a copy of relevant portions of the report to the prosecution for use in cross-examining the investigator: "[B]y electing to present the investigator as a witness," the Supreme Court held, the defense "waived the [work-product] privilege with respect to matters covered in his testimony." *Id.* at 239, 95 S.Ct. 2160. Although attorneys do not waive the privilege by using their "notes, documents, and other

internal materials" to present their case, or by relying on them to examine witnesses, where "counsel attempts to make a testimonial use of these materials the normal rules of evidence come into play with respect to cross-examination and production of documents." *Id.* at 239 n. 14, 95 S.Ct. 2160.

In the second case, *In re Martin Marietta Corp.*, 856 F.2d 619 (4th Cir.1988), a criminal defendant and former employee of Martin subpoenaed certain company documents for use in his defense. The Fourth Circuit refused to allow the company to invoke the work-product privilege to resist the subpoena, ruling that by having made testimonial use of the documents in a prior proceeding, it waived the privilege. Though Martin Marietta had not actually disclosed all requested documents in the prior case, it had disclosed portions of some during settlement negotiations, expressly assuring its adversary that it had disclosed all documents relevant to the settlement as part of a "direct attempt to settle active controversies" between the two parties. *Id.* at 625. According to the Fourth Circuit, this constituted "testimonial use" "impliedly waiv[ing] the work-product privilege as to all non-opinion work-product on the same subject matter as that disclosed." *Id.*

In *Sealed Case*, the third case Rockwell cites, we held that a company could not invoke the work-product privilege to avoid a grand jury subpoena of certain documents relating to alleged securities law violations. 676 F.2d at 818–25. Though the company had not previously disclosed the subpoenaed documents, it had disclosed related documents to the SEC as part of a "voluntary disclosure program," during which it gave the SEC a report discussing its own possible securities law violations, together with documents and notes of interviews upon which the report was based. *Id.* at 818. By participating in the disclosure program, we concluded, the company had in effect agreed to disclose to the SEC *all* files relating to the subject matter of the investigation. *Id.* at 822–23. But we also thought that because the grand jury had before it the report and attached documents, and because the withheld documents revealed a "highly embarrassing[ ] version of events" at odds with the version described in the report, *id.* at 822, the situation was "analogous to the 'testimonial use' that the Supreme Court in *Nobles* held to imply a waiver":

> In the instant case the investigative counsel's final report refers to files that were furnished to the lawyers preparing the report, and it purports to reflect the relevant material in those files. Just as in a criminal trial the government and the jury have a right to evaluate a witness' account of his notes he had taken shortly after a crime by evaluating those notes, ... the grand jury [has] a right to evaluate Company's report by examining the documents it purports to reflect.

*Id.* at 822 n. 124 (internal citations omitted).

■ We disagree with Rockwell that these three cases require disclosure of the attachments. "The test under Exemption 5 is whether the documents would be 'routinely' or 'normally' disclosed upon a showing of relevance" by a party in litigation with the agency. *FTC v. Grolier Inc.*, 462 U.S. 19, 26, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983) (quoting *Sears*, 421 U.S. at 148–49, 95 S.Ct. 1504). Just because the courts required disclosure in *Nobles*, *Martin Marietta*, and *Sealed Case* does not mean that the documents in those cases were "'routinely' or 'normally' disclos[able] upon a showing of relevance." To the contrary, all three cases required disclosure at least in part because their particular circumstances made doing so necessary to protect the adversary system. In *Nobles*, the defense attempted to invoke work-product privilege in a way that would have threatened the prosecution's ability to engage in effective cross-examination. In *Martin Marietta*, the company attempted to invoke work-product privilege in a way that would have threatened an accused's right

to secure evidence in his favor. *See* 856 F.2d at 621 (discussing the "Sixth Amendment guarantee that an accused have compulsory process to secure evidence in his favor"). In *Sealed Case,* the company attempted to invoke the privilege in a way that would have blocked a grand jury's access to relevant evidence, thus deceiving and misleading it. *See* 676 F.2d at 806 ("Nowhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena."); *id.* at 822 (noting Company's "sleight-of-hand" and attempted "manipulation" of the grand jury).

It is conceivable that a case might arise in which testimonial use of work-product documents would in effect lead to a general waiver of the privilege—where an agency's use of the documents would mean that virtually *any* plaintiff suing the agency on a related matter would be able to obtain disclosure of those documents. But we need not decide here whether such circumstances would render the documents "routinely" or "normally" disclosable for purposes of FOIA, for in this case, the Justice Department made no testimonial use of the attachments. It did not use them in an adversary proceeding, nor in anything related to or even remotely resembling an adversary proceeding, but instead deployed them in a dispute with a co-equal branch of government and in the ensuing struggle for public opinion.

Rockwell acknowledges that the Report was not submitted in an adversary proceeding, but nonetheless argues that "[t]here is no apparent reason ... why the government should be able to obtain unfair advantage over members of the public by choosing selective disclosure of otherwise privileged documents, and such a result is contrary to the spirit of FOIA." Appellant's Br. at 31. Rockwell misunderstands FOIA's purposes. Congress intended Exemption 5 to protect documents covered by the litigation privileges. *See Formaldehyde Institute,* 889 F.2d at 1121. Our decision does precisely that: it protects the "files and mental impressions" of Justice Department attorneys preparing the Rocky Flats prosecution. We are, moreover, untroubled by the notion that in releasing the Report without the attachments, the Attorney General may have put only the Department's best face forward. As we noted earlier, we have allowed "selective disclosure" of protected documents "even in some circumstances to an adversary" in formal litigation. *Sealed Case,* 676 F.2d at 818. Equally important, especially in view of the intense controversy surrounding recent executive branch actions, we think—contrary to Rockwell's assertion—that it serves the public interest to give attorneys general and other cabinet officials every incentive to disclose the results of internal investigations, even if they do so in a way that presents their agencies in the best possible light. Other ways exist to hold executive branch officials accountable, such as congressional oversight hearings and civil litigation.

## V

Because the Department claims work-product privilege for all relevant documents, and because it has not waived the privilege, the documents are protected by Exemption 5. We therefore need not consider Rockwell's remaining claims that the Department waived the attorney-client and deliberative-process privileges with respect to certain specific attachments. We affirm the judgment of the district court.

*So ordered.*