**UNITED STATES of America ex rel. Robert R. PURCELL, Plaintiff,**

v.

**MWI CORPORATION, et al., Defendants.**

No. Civ.A. 98–2088(RMU).

United States District Court, District of Columbia.

Aug. 26, 2002.

Benjamin J. Vernia, Commercial Litigation Branch, U.S. Department of Justice, Washington, D.C., Keith V. Morgan, U.S. Department of Justice, Washington, D.C., for the government.

Joseph J. Aronica, Porter, Wright, Morris & Arthur, LLP, Washington, D.C., for the relator.

Mary C. Spearing, Baker & Botts, Washington, D.C., William R. Scherer, Jr., Conrad & Scherer, Ft. Lauderdale, FL, for MWI Corp.

Peter R. Kolker, Jennifer Di Toro, Zuckerman Spaeder, LLP, Washington, D.C., for J. David Eller.

## *MEMORANDUM OPINION*

URBINA, District Judge.

### RULING FOR THE GOVERNMENT ON THE PRIVILEGE ISSUE; ADOPTING THE DEFENDANTS' ALTERNATIVE PROPOSAL FOR THE PROTECTIVE ORDER

### I. INTRODUCTION

This *qui tam* action comes before the court on a discovery dispute. Because the initial work-product dispute raises a novel question of law, the court provides an in-depth explanation of its reasoning.

Robert Purcell ("the relator") brings this case pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733. As is its option pursuant to 31 U.S.C. § 3730(b)(4), the government intervened in this action and now brings suit on its own accord against the MWI Corporation ("MWI") and J. David Eller (collectively, "the defendants"). The instant discovery dispute arose during the parties' preparation for the taking of the deposition of a key witness in the case. In the process of turning over documents related to this witness to the defendants, the government asserted that certain documents are covered by the joint-prosecutorial privilege between the government and the relator in *qui tam* cases. The defendants argue that no such privilege exists.

The court disagrees with the defendants' position and, for the reasons that follow, holds that such a privilege does exist in *qui tam* cases in which the government elects to intervene. Consequently, the court denies the defendants' emergency motion to continue the deposition of Mr. Leonard Johnson since the requested continuance is now moot. Additionally, the court adopts the defendants' proposed alternative for a protective order before the production of discovery materials.

## II. BACKGROUND

On August 28, 1998, the relator filed his original complaint. After filing multiple requests for extensions of time to determine whether it would intervene, the government filed a notice of election to intervene in this FCA case pursuant to 31 U.S.C. § 3730. Gov't's Notice of Election to Intervene dated Jan. 28, 2002. As per the government's request, the court ordered that the complaint in this action "be unsealed and served upon the defendants by the United States." Order dated Jan. 31, 2002. The court also ordered that the seal be lifted as to all future matters in this case. *Id.* Finally, the court directed the government to serve its complaint in intervention within 30 days of the January 31 Order. *Id.* On April 4, 2002, the government filed an amended complaint ("the complaint") in intervention.[1]

The government alleges that the defendants failed to disclose to the Export Import Bank of the United States ("EXIM") various commissions, other payments and agreements to make payments in connection with their sale of irrigation and pumping equipment to the Federal Republic of Nigeria. Compl. at 1. The EXIM financed the equipment. *Id.* at 1. The government seeks treble damages and civil penalties. *Id.* The plaintiff is the United States, acting on behalf of the EXIM. *Id.* at 2. The relator is Robert Purcell, who was formerly the Vice President of National Sales at MWI. *Id.* A Florida corporation, defendant MWI manufactures, assembles, sells and distributes pumping equipment and related items used primarily for irrigation and drainage. *Id.* Defendant J. David Eller was President and owner of MWI from 1989 to 1994. *Id.* On May 28, 2002, the defendants filed a motion to dismiss the complaint. The court will resolve that motion in a future ruling.[2]

The instant discovery dispute arose when the parties sought a ruling from the court about the parameters of discovery relating to one key witness ("the witness"), whose deposition the parties agreed to take on February 6, 2002. Because the witness is very ill, the deposition date occurred earlier than it would otherwise have in the normal course of business. On January 29, 2002, the court held a discovery dispute conference call to hear the parties' arguments about which, if any, documents related to the witness should be turned over to the defendants. The court ruled that the government and the relator had to: turn over all documents relating to the witness (including those in the possession or control of the witness); provide a calculation of damages, as per Federal Rule of Civil Procedure 26(a)(1)(C); and provide a description of any other documents that the relator had, as per Rule 26(a)(1)(B). On the other hand, the court ruled that the government and the relator did not need to provide the names and addresses of witnesses, as per Rule 26(a). Lastly, the court ordered that all of these requirements be completed by Friday, February 1. Defense counsel indicated during the call that it would turn over similar categories of documents.

On February 5, 2002, the defendants filed an emergency motion to continue the deposition of the witness and a motion for a protective order. The court held a follow-up conference call that same day with counsel for the defendants, the government and the relator. During the conference call, defense counsel summarized the grounds for its motion, and counsel for the government and the relator both explained their reasons for opposing the motion. The relevant point for this discussion is that the defendants challenged the government's assertion of a joint-prosecutorial privilege between the government and the relator in FCA cases as the basis for the government's non-production of certain documents.

After assessing the parties' arguments, the court issued an order denying the defendants' emergency motion to continue the witness's deposition and for a protective order.[3]

---

1. The court hereby grants *nunc pro tunc* the government's unopposed motions to extend the time for the filing of its complaint.

2. In a joint status report pursuant to Local Civil Rule 16.3, the parties ask for a status conference. After ruling on the defendants' motion to dismiss, the court will turn to the issue of setting a status conference.

3. On the morning of February 6, 2002, the court also convened a conference call before the witness's deposition to inform the parties of the

Order dated Feb. 6, 2002. In that order, the court said it would review the work-product privilege issue and would render a ruling. *Id.* Subsequently, the defendants submitted a "supplemental filing" to further inform the court about its reasons for a reconsideration of the February 6 ruling, which directly corresponds to the work-product issue. Defs.' Supplemental Filing at 1.[4]

Meanwhile, on July 3, 2002, the defendants filed a motion for a protective order to restrict the government's use of "data and material including a substantial amount of proprietary financial and operational information relating to defendant MWI's business and Mr. Eller's personal financial records." Defs.' Mot. for Protective Order at 1–2. The defendants contest the government's request on the ground that the production of this material would harm MWI's competitive position in the business of manufacturing and marketing large industrial pumps for international sale. *Id.* at 2. The court now turns to the disputes over the joint-prosecutorial privilege and the protective order.

## III. ANALYSIS

In the February 5, 2002 conference call, the government argued that when two parties to litigation have a common interest against the opposing side, those two parties can share work product without waiving the work-product privilege. In FCA cases, the government contends that it and the relator have totally congruent interests in opposing the defendants. Accordingly, the government submits that a joint-prosecutorial privilege exists in these cases, which serves to prevent disclosure to the defendants of communications between the relator's counsel and the government's counsel. Defs.' Emergency Mot. to Continue Dep. and Mot. for Protective Order dated Feb. 5, 2002 ("Defs.'

Emergency Mot.") Ex. B (Letter from Gov't) at 1–2. The defendants correctly counter that they are "aware of no federal appellate court that has recognized that such a privilege exists between the government and the relator."[5] Defs.' Emergency Mot. Ex. A (Letter from Defs.' Counsel dated Feb. 4, 2002) at 2.

While several other district courts have addressed this issue, this district has never faced this question. On this matter of first impression, the court holds that a joint-prosecutorial privilege does exist between the government and the relator in *qui tam* cases.

### A. Legal Standard for the Joint–Prosecutorial Privilege

Parties may not obtain discovery regarding privileged matters. FED.R.CIV.P. 26(b)(1). The attorney-client privilege and the work-product privilege represent two well-recognized discovery privileges. FED. R.CIV.P. 26(b)(2)–(3); *In re Sealed Case*, 676 F.2d 793, 808 (D.C.Cir.1982). A party who asserts such a privilege bears the burden of establishing that the privilege exists. *E.g., United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir.1989). If a party waives a privilege, then the opposing party may obtain the otherwise privileged information through discovery. *E.g., In re Subpoenas Duces Tecum*, 738 F.2d 1367, 1369 (D.C.Cir.1984) (citations omitted); *Greater Newburyport Clamshell Alliance v. Pub. Serv. Co.*, 838 F.2d 13, 17 (1st Cir.1988).

Unlike the attorney-client privilege, the work-product privilege applies not only to communications but to material "obtained or prepared by an adversary's counsel." *In re Sealed Case*, 676 F.2d at 808–09 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). Courts justi-

---

court's ruling that the full deposition, including the cross-examination, should take place that day.

**4.** The court reminds the defendants that "[l]eave of court is required before the filing of a discovery dispute-related motion." Standing Order for Civil Cases (Urbina, J.) ¶ 9. Because the court has yet to issue a standing order in the case at bar (although it is available on the court's website at http://www.dcd.uscourts.gov/RMUrbina-page.html), the court will not strike the defen-

dants' filing. In the future, however, the court may decide to strike such a motion, if a party files it without the court's permission.

**5.** As discussed *infra*, despite the lack of authority on the exercise of the joint-prosecutorial privilege in FCA cases, the Fourth Circuit ruled in favor of its use in another discovery dispute. *In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir.1990).

fy the broader expanse of the work-product privilege because it is intended not merely to maintain confidentiality but also to preserve "the vitality of the adversary system." *Id.* at 809; *Rockwell Int'l Corp. v. Dep't of Justice,* 235 F.3d 598, 605 (D.C.Cir.2001) (quotation omitted). Similarly, a party does not automatically waive the work-product privilege by disclosure to a third party. *Id.*

Courts also recognize both a joint-defense privilege and a common-interest privilege. The D.C. Circuit has explained that "[t]he joint defense privilege protects communications between two or more parties and their respective counsel if they are engaged in a joint defense effort." *In re Sealed Case,* 29 F.3d 715, 719 n. 5 (D.C.Cir. 1994) (citation omitted). The Court of Appeals continued by noting that a party who asserts the joint-defense privilege must show that: "(1) the communications were made in the course of a joint defense effort; (2) the statements were designed to further the effort; and (3) the privilege has not been waived." *Id.* (quoting *In re Bevill, Bresler & Schulman Asset Mgt. Corp.,* 805 F.2d 120, 126 (3d Cir.1986)). Similarly, the common-interest privilege "protects communications between a lawyer and two or more clients regarding a matter of common interest." *Id.* at 719 (citations omitted).

The overarching principle that governs these privileges remains the same—protecting attorney-client correspondence on matters of common interest and "protecting attorneys' preparations for trial and encouraging the fullest preparation without fear of access by adversaries." *United States v. AT & T Co.,* 642 F.2d 1285, 1300 (D.C.Cir.1980); *see also Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (stating that the purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients ...."). "[T]he joint defense or common interest rule ... applies not only to communications subject to the attorney-client privilege, but also to communications protected by the work-product doctrine." *In re Grand Jury Subpoenas,* 902 F.2d at 249 (citation omitted).

Extending the principle underpinning the joint-defense privilege, several courts have recognized the joint-prosecutorial privilege as a parallel privilege. *United States ex rel. Burroughs v. DeNardi Corp.,* 167 F.R.D. 680, 685–86 (S.D.Cal.1996) (citing *In re Grand Jury Subpoenas,* 902 F.2d at 249); *Loustalet v. Refco, Inc.,* 154 F.R.D. 243, 247 (C.D.Cal. 1993); *Sedlacek v. Morgan Whitney Trading Group,* 795 F.Supp. 329, 331 (C.D.Cal.1992). The Fourth Circuit explicitly includes both the defendants and the plaintiffs when applying the joint privilege stating:

> whether the *jointly interested persons are defendants or plaintiffs* ... the rationale for the joint defense rule remains unchanged: persons who share a common interest in litigation should be able to communicate with their respective attorneys and with each other to more effectively prosecute or defend their claims. The district court's ruling, apparently based on the notion that the joint defense privilege is limited to codefendants, was in error.

*In re Grand Jury Subpoenas,* 902 F.2d at 249 (emphasis added). The *Sedlacek* court also noted that although the Ninth Circuit has not yet had the opportunity to adopt a joint-prosecution privilege, "a refusal to apply the privilege was also error." 795 F.Supp. at 331.

To allow this important privilege to protect a joint defense without extending similar work-product protections to a joint prosecution would not be fair. *Sedlacek,* 795 F.Supp. at 331 (holding that the plaintiffs must enjoy the same joint privilege, "[o]therwise, cooperating defendants would be situated better than their plaintiff counterparts"). Work-product protection recognizes a complex web of interrelated interests. As the D.C. Circuit has held:

> the truth-finding process might be further enhanced in the short term in this particular case if [the party seeking discovery] gained access to the documents in question. In the long run, however, this would discourage trial preparation and vigorous advocacy and would discourage any party

from turning over work product to the government.

*AT & T Co.,* 642 F.2d at 1300.

### B. The False Claims Act

The FCA establishes civil liability for any person who knowingly makes, uses, or causes to be made or used a "false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a). The statute allows a private citizen ("the relator" or the *"qui tam* plaintiff") to bring a civil action for violation of the FCA "in the name of the Government." 31 U.S.C. § 3730(b). The *qui tam* provisions encourage "a rogue to catch a rogue" to offset inadequate law-enforcement resources. *United States ex rel Findley v. FPC–Boron Employees' Club,* 105 F.3d 675, 679 (D.C.Cir. 1997). Moreover, if the government decides to proceed with an action brought by the relator, then the relator shall receive a bounty of at least 15 but not more than 25 percent of the proceeds of the action or settlement of the claim, "depending upon the extent to which the person substantially contributed to the prosecution of the action." 31 U.S.C. § 3730(d).

The court's "fundamental task in interpreting the FCA is 'to give effect to the intent of Congress.' " *Findley,* 105 F.3d at 681 (quoting *United States v. American Trucking Ass'ns,* 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940)). Accordingly, by the very language of the FCA statute, Congress has made it clear that it intended to align the interests of the relator with the interests of the government in these cases. 31 U.S.C. § 3730; *see also Burroughs,* 167 F.R.D. at 686 (stating that "the False Claims Act ... itself provides ample support that plaintiff and the government share sufficient common interests, as against the defendants"). By allowing the relator to bring the action "in the name of the Government" and by allowing the relator to receive a percentage of the proceeds that the government recovers, the legislature left no doubt that the relator is acting on behalf of the government. 31 U.S.C. § 3730. Indeed, the "[*qui tam* ] plaintiff and the government essentially stand in the same shoes as against the defen-

dants." *Burroughs,* 167 F.R.D. at 686. Put another way, "[f]or all practical purposes, plaintiff and the government are essentially the same party." *Id.*

The court's interpretation of the FCA's language must include an examination of the design of the statute as a whole and to its object and policy. *Findley,* 105 F.3d at 681 (quoting *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (citations omitted)). The FCA aims to advance the twin goals of (1) rejecting suits which the government is capable of pursuing itself while (2) *promoting those which the government is not equipped to bring on its own. United States ex rel. Springfield Terminal Ry. v. Quinn,* 14 F.3d 645, 651 (D.C.Cir.1994) (emphasis added). While the relator perhaps may be motivated by self-interest in seeking the bounty, the government will presumably decide not to intervene if, after assessing the evidence presented by the relator and conducting its own preliminary investigation, it believes the action lacks merit. Additionally, the statute promotes *only* those cases in which the government works together with the relator and the relator's attorney to join prosecutorial efforts and to pursue FCA cases more successfully. *Id.* In sum, the clear intent of Congress to align the interests of the relator with those of the government in FCA cases argues strongly for the government's position that a joint-prosecutorial privilege should exist.

### C. A Joint–Prosecutorial Privilege Exists in False Claims Act Cases

 The weight of the limited authority favors the government's position that a joint-prosecutorial privilege exists in FCA cases. Even cases holding that most of the material evidence that the relator provides to the government must be turned over to the defendants do not take the position that no such privilege exists. *United States ex rel. O'Keefe v. McDonnell Douglas Corp.,* 918 F.Supp. 1338, 1346 (E.D.Mo.1996). The court simply asserts that "[t]he burden is on the party asserting a privilege to establish the applicability of that privilege." *Id.* Similarly, based on the common theme that both the joint-defense and joint-prosecutorial priv-

ileges seek to protect confidential communications concerning a common interest in the same litigation, the court views the joint-prosecutorial privilege as a logical and natural extension of the work-product doctrine, much like the joint-defense privilege.

The defendants' primary contention for why the privilege should not exist is that the government cannot benefit from the work-product privilege that would normally protect communications between the relator and his attorney. Defs.' Emergency Mot.Ex. A at 1. The defendants state that the specific material requested was "authored by [the][r]elator's counsel" and therefore the government cannot now claim similar work-product privileges once the relator's counsel provides that information to the government. *Id.* at 2. Yet, despite the assertion that Mr. Purcell is a private citizen who voluntarily disclosed this information, he is the relator in this case who made communications to his attorney to further the joint-prosecutorial effort now brought by the government.

Without those communications, the government could not proceed with its case. *Springfield Terminal Ry.*, 14 F.3d at 651. In fact, the unique relationship of the government and the relator in *qui tam* cases requires the sharing of the work product generated between the relator and his attorney with the government in order for the case to proceed. *AT & T Co.*, 642 F.2d at 1300. Following an analogous line of reasoning, the D.C. Circuit underscored this point in an antitrust case originally brought by private parties:

> "The Government has the same entitlement as any other party to assistance from those sharing common interests, whatever their motives ... This policy should not be thwarted by allowing an alleged antitrust offender to acquire the trial preparations of his private adversaries when they cooperate with Government lawyers in a related suited by the Justice Department."

*Id.* In FCA cases, the government's intervention still maintains a common interest between the government and the relator and the parties' attorneys may logically choose to share communications and written material as though they are functioning as joint parties. Defs.' Statements dated Feb. 5, 2002. For all these reasons, the court holds that in FCA cases in which the government intervenes,[6] a joint-prosecutorial privilege exists between the government and the relator.[7]

**D. The Court Adopts the Defendants' Alternative to the Previously Drafted Protective Order for Discovery Materials**

 A protective order requires that "a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way." FED.R.CIV.P. 26(c)(7). A trial court possesses broad discretion in issuing a protective order and in determining what degree of protection is required. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984); *see also United States v. Microsoft Corp.*, 165 F.3d 952, 959 (D.C.Cir.1999). Both parties correctly point to the proper test to assess whether there is a sufficient showing of good cause to issue the requested protective order. *Burka v. Dep't of Health and Human Servs.*, 87 F.3d 508, 517 (D.C.Cir.1996); Defs.' Mot. for Protective Order at 2; Gov't's Opp'n to Defs.' Mot. for Protective Order ("Gov't's Opp'n") at 2. In *Burka*, the D.C. Circuit outlines several factors a district court must assess before deciding whether to issue a protective order:

> The decision to limit or deny discovery by means of a Rule 26 protective order rests on a balancing of several factors: the requester's need for the information from this particular source, its relevance to the litigation at hand, the burden of producing the sought-after material; and the harm

---

6. The court's holding does not address FCA cases in which the government declines to intervene.

7. Moreover, despite the government's disclosure of one relator-privileged document, which the government contends was "inadvertently disclosed to Mr. Johnson," the "mere showing of a voluntary disclosure to a third person ... should not suffice in itself for waiver of the work-product privilege...." *Rockwell Int'l Corp.*, 235 F.3d at 605 (quoting *American Tel. & Tel. Co.*, 642 F.2d at 1299).

which disclosure would cause to the party seeking to protect the information.

*Burka,* 87 F.3d at 517 (citation omitted); *see also Amfac Resorts, L.L.C. v. Dep't of the Interior,* 143 F.Supp.2d 7, 14 (D.D.C.2001)

The defendants press their request for a protective order based solely on the final factor, i.e., "the harm which disclosure would cause to the party seeking to protect the information." Defs.' Mot. for Protective Order at 2; *Burka,* 87 F.3d at 517. The defendants assert that the unrestricted release of financial information and trade secrets to the relator would harm MWI's competitive position because the relator is currently employed as the Director of Marketing of Farmer's Pump Industries ("FPI"). Defs.' Mot. for Protective Order at 2. "FPI also manufactures and sells large industrial pumps and related equipment and is a direct competitor to MWI." *Id.* The government argues that the defendants' inability to specify potentially damaging documents and their conclusory showing of good cause represents insufficient grounds on which to grant a protective order. Gov't's Opp'n at 1–3. The government believes "the purpose of the defendants' motion actually seems to be not to protect sensitive information but rather to limit the government [sic] and relator's abilities to make their case." *Id.* at 4.

▮▮▮ In ruling on a protective order, the Supreme Court requires "some 'showing of good cause' be made prior to issuing a protective order under Rule 26(c)." *Equal Employment Opportunity Comm'n v. Nat'l Children's Ctr., Inc.,* 98 F.3d 1406, 1411 (citing *Seattle Times Co.,* 467 U.S. at 31, 37, 104 S.Ct. 2199). Good cause includes "protect[ing] a party or person from annoyance, embarrassment, oppression, or undue burden or expense...." *Microsoft Corp.,* 165 F.3d at 959. In this case, the defendants assert that "[t]he unrestricted release ... would be detrimental to MWI's competitive position," and "[d]efendants will suffer significant harm...." Defs.' Mot. for Protective Order at 2. The court determines that the defendants have met their burden of making

"some 'showing of good cause'...." *Nat'l Children's Ctr., Inc.,* 98 F.3d at 1411 (quotations omitted).

▮▮▮ In their reply, the defendants propose a reasonable compromise solution. While they have no objection to the government's full access to and use of the information for the government's specific use in prosecuting this case, they only seek to exclude Mr. Purcell himself from having access to certain proprietary information. Defs.' Reply at 5. To mollify the government's concern that a protective order would hinder its case, the defendants propose that, in the alternative, Mr. Purcell's counsel, under an "attorney's eyes only" agreement, may have access to the information as well. *Id.* The court adopts this alternative because the government will be able to litigate its case fully and this course of action will not compromise MWI's proprietary interests. The court thus approves a protective order preventing only Mr. Purcell, the relator himself, from having any access to the materials at issue.[8]

## IV. CONCLUSION

For all these reasons, the court holds that a joint-prosecutorial privilege exists between the government and the relator in *qui tam* cases when the government intervenes. The court adopts the defendants' alternative proposal for a protective order limiting disclosure to the government and the relator's counsel. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this _____ day of August, 2002.

## ORDER

Ruling for the Government on the Privilege Issue; Adopting the Defendants' Alternative Proposal for the Protective Order

For the reasons stated in this court's Memorandum Opinion separately and contemporaneously issued this _____ day of August, 2002, it is hereby

---

8. In accordance with this ruling, the parties shall jointly submit a proposed protective order for the court's approval within 15 days of the date of issuance of this Memorandum Opinion and Order.

ORDERED that the defendants' motion on the work-product privilege is **DENIED;** and it is

**FURTHER ORDERED** that the defendants' alternative proposal for a protective order (as set forth in their reply brief in support of a protective order) is **GRANTED.**

**SO ORDERED.**

