FLATHEAD JOINT BOARD OF CON-
TROL, Flathead Irrigation District,
Mission Irrigation District, and Jocko
Irrigation District, Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, United States Bu-
reau of Indian Affairs, and United
States Bureau of Reclamation, Defen-
dants,

and

Confederated Salish and Kootenai
Tribes, Defendant–Intervenor.

No. CV 02–38–M–DWM.

United States District Court,
D. Montana,
Missoula Division.

Feb. 3, 2004.

Jon Metropoulos, Gough, Shanahan, Johnson & Waterman, Helena, MT, for Plaintiffs.

George F. Darragh, Jr., Office of the U.S. Attorney, Great Falls, MT, for Defendants.

John B. Carter, Debra T. DuMontier, Confederated Salish & Kootenai, Tribes, Legal Department, Pablo, MT, for Intervenor–Defendant.

## ORDER

MOLLOY, Chief Judge.

Plaintiffs, Defendants, and Defendant–Intervenor have all filed motions for summary judgment in this matter. The following order is based on the *Vaughn* index filed with the Court and the parties' briefs. *Lion Raisins Inc. v. United States Dept. of Agriculture*, 354 F.3d 1072, 2004 WL 63620, *5 (9th Cir.2004); *Vaughn v. Rosen*, 484 F.2d 820, 823–25 (D.C.Cir.1973).

### I. Introduction & Factual Background

The Flathead Joint Board of Control ("Joint Board") made Freedom of Information Act ("FOIA") requests to the Bureau of Indian Affairs and the Bureau of Reclamation, both agencies within the United States Department of the Interior, to obtain information regarding the allocation of water rights on the Flathead Reservation, home of the Confederated Salish and Kootenai Tribes ("CSKT" or "Tribes"). The CSKT, the Joint Board, and the State of Montana are currently involved in a general stream adjudication process under the Montana Water Use Act (MCA § 85–2–101), which has been underway since the 1980s. Under *Arizona v. San Carlos Apache Tribe*, 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983), states have jurisdiction to adjudicate the water rights of tribes within their boundaries. The United States is participating in the negotiations as part of its trust obligation to the Tribes. *Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts v. United States and CSKT*, 832 F.2d 1127, 1132 (9th Cir. 1987). The information sought by the Joint Board was provided to the BIA and Bureau of Reclamation in association with this adjudication and the Tribes' negotiations with the state.

The Tribes' water rights are not of the same nature as irrigators' water rights generally. The Tribes have reserved ab-

original fishing rights that entitle them to sufficient water to maintain the fisheries within the boundaries of the reservation, as well as to support other uses. This right precedes irrigators' and other water rights on the Reservation under the "first in time, first in right" principle. *United States v. Adair*, 723 F.2d 1394 (9th Cir. 1983), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). These fishing rights were obtained by the Tribes through the Hell Gate Treaty, which secured to the tribes "the exclusive right of taking fish in all the streams running through or bordering said reservation." Treaty of July 16, 1855, 12 Stat. 975. Therefore, "[s]tate appropriative water rights and Indian reserved water rights differ in origin and definition. State-created water rights are defined and governed by state law. Indian reserved water rights are created or recognized by federal treaty, federal statute or executive order, and are governed by federal law." *State of Montana ex rel. Mike Greely v. Confederated Salish and Kootenai Tribes*, 219 Mont. 76, 89, 712 P.2d 754 (Mont.1985) (internal citations omitted).

The Joint Board's FOIA request is modeled after the successful request of a group called the Klamath Water Users in a similar dispute in Oregon. *Department of the Interior and Bureau of Indian Affairs v. Klamath Water Users Protective Association*, 532 U.S. 1, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). In that case, the U.S. Supreme Court said that the DOI had to release irrigation information in its possession to the Water Users and could not rely on Exemption 5 to the FOIA (for intra-agency memoranda) as a way to avoid releasing the documents. The Tribes in this case distinguish their situation from that of the tribes in *Klamath Water Users*.

The extent to which *Klamath Water Users* applies is at the heart of this dispute.

This Court denied Defendants' motion to dismiss on November 26, 2002. The United States filed a *Vaughn* index on February 19, 2003. Before the Court now are motions for summary judgment by all parties.

## II. Analysis

 The Freedom of Information Act was intended to "pierce the veil of administrative secrecy and open agency action to the light of public scrutiny." *Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (citation omitted). "In reviewing de novo a grant of summary judgment for the government in a FOIA case, the court therefore remains mindful that the burden is on the agency to show that requested material falls within a FOIA exemption." *National Association of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C.Cir.2002) (internal quotations and citations omitted).

The United States has submitted a *Vaughn* index that describes each withheld document and identifies the FOIA exemption that permits withholding. There are many documents in the index that the Government now concedes should be disclosed. The dispute is over the applicability of two FOIA exemptions, Exemptions 4 and 5.

### A. Exemption 4

Exemption 4 covers, in part, "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. 552(b)(4). Thus, there are three essential characteristics of an exempt document. The parties disagree about what constitutes financial or commercial information.[1] The real fight, Defendants ar-

---

1. The Tribes and the U.S. argue that the Joint Board conceded elements two and three of the test-obtained from a person and privileged or confidential-by not responding to those issues in its briefs. U.S. Response Br., 5.

gue, is whether various water rights and assessment information is accurately considered commercial and/or financial.[2]

### 1. Commercial or financial

■ After *National Association of Home Builders v. Norton,* 309 F.3d 26 (D.C.Cir.2002), Plaintiffs claim that "natural resource information" generally is not protected by Exemption 4. The district court had granted summary judgment to the Secretary of the Interior on Exemption 6, claiming it prevented disclosure, but held that Exemptions 3, 4, and 5, did not cover the information. On appeal, the D.C. Circuit concluded that information about the location of endangered pygmy owls could not be withheld under Exemption 6, which protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6).

The D.C. Circuit also agreed with the district court that Exemptions 4 and 5 did not apply and addressed those exemptions briefly. The Secretary had argued that Exemption 4 applied because the information was provided through government-to-government cooperation or agreement and that certain restrictions on its use made it commercial information. The Court disagreed, saying Exemption 4 was inapplicable. The New Mexico state agency that created the list was prevented by law from selling it. It was exchanged between the state and federal governments "quid pro quo," which did not amount to a "commercial transaction in the ordinary sense." "[T]he owl-sighting data itself is commercial neither by its nature (having been created by the government rather than in connection with a commercial enterprise) nor in its function (as there is no evidence

that the parties who supplied the owl-sighting evidence have a commercial interest at stake in its disclosure.)" *NAHB,* at 38–39 (internal citations omitted).

Plaintiffs interpret this case broadly to cover "natural resource information." However, the location of a non-commodity animal is, on its face, different from information generated through proprietary computer programs, regarding a commercial subject, and involving other information not readily obtainable by the public. Therefore, *NAHB* does not control this issue, as Plaintiffs argue.

In *Public Citizen Health Research Group v. Food and Drug Administration,* 704 F.2d 1280 (1983), the D.C. Circuit considered whether records produced during ongoing clinical trials of the safety and efficacy of intraocular lenses were protected under Exemption 4. The court concluded that "[b]ecause documentation of the health and safety experience of their products will be instrumental in gaining marketing approval of their products, it seems clear that the manufacturers of IOLs have a commercial interest in the requested information." *Public Citizen,* at 1291. The court did not precisely define commercial information, but it is apparent that commercial information need not be actively commercial at the time of assessment, but rather information that will in future be involved in commercial dealings.

None of these cases defines "commercial" except to rely on its plain meaning. In *American Airlines, Inc. v. National Mediation Board,* 588 F.2d 863, 870 (2nd Cir.1978), the court wrote " 'Commercial' surely means pertaining or relating to or dealing with commerce," stating there that "the commercial nature of the information

---

**2.** *Klamath Water Users* dealt only with Exemption 5 and is therefore inapposite to this section.

is apparent." No case deals specifically with Exemption 4 and water rights.

There is no doubt that water rights themselves are an object of commerce. They are a property interest that is bought and sold. There are usually limited water rights available. Therefore, information about the quantity available to a single holder, a holder's use or priority date, or other similar information would be commercial information, used in negotiating real estate transactions, water leasing, and other commercial dealings. In the Tribes' case, this including protecting a healthy fishery and the economic benefits that flow therefrom. The Joint Board seeks this information and water for commercial purposes, and CSKT is protecting it for commercial and financial purposes. The more difficult question here is to what extent the tools and strategies related to creating this commercial information are also, themselves, commercial information. In *NAHB*, the court made a distinction between information's nature, that is, created by the government, and its function, having some commercial purpose preventing its disclosure. *NAHB*, 309 F.3d at 39. In this case, the nature of the information is not commercial, if, according to *NAHB*, information produced by a government is not. But the information leads to negotiation over a very valuable asset, and successful negotiations on the part of the Tribes will result in the Tribes having more of this valuable asset. Therefore, the information that creates the Tribes' negotiating position, supports their claims, and results in maximizing the Tribes' position is all commercial information in function.[3]

### 2. From a person

"Person" is defined in FOIA to include "an individual, partnership, corporation, association, or public or private organization other than an agency." 5 U.S.C. § 551(2). ("Agency" is defined as an authority of the United States government, with exceptions.) An Indian tribe "as a corporation that is not part of the Federal Government, is plainly a person within the meaning of the Act." *Indian Law Resource Center v. Dept. of the Interior*, 477 F.Supp. 144, 146 (D.D.C.1979).

### 3. Privileged or confidential

■ What is confidential or privileged is defined by *National Parks and Conservation Association v. Morton*, 498 F.2d 765 (D.C.Cir.1974). Exemption 4 allows the government to garner important information to perform its functions. *National Parks*, at 767. "Apart from encouraging cooperation with the Government by persons having information useful to officials, section 552(b)(4) serves another distinct but equally important purpose. It protects persons who submit financial or commercial data to government agencies from the competitive disadvantages which would result from its publication." *National Parks*, at 768. The *National Parks* test for confidentiality, therefore, is whether its disclosure would impede the Government's functioning, and whether its disclosure would subject the person to a competitive disadvantage. *National Parks*, at 770.

The Ninth Circuit has discussed Exemption 4 only in the context of what is or should be confidential. (In both of the Ninth Circuit cases dealing with Exemp-

---

**3.** Non-tribal water rights information in Montana is a matter of public record. *See* the Montana Department of Natural Resources and Conservation's webpage at http://www.dnrc.state.mt.us/wrd/home.htm, which provides public access to extensive water right information, including the owner's name, the amount of water allowed, and its source. Therefore, water rights information is commercial but in Montana would not meet the confidential prong to qualify for Exemption 4 non-disclosure.

tion 4, the parties stipulated that the information was commercial in nature.) The Ninth Circuit adopted the D.C. Circuit's *National Parks* test for confidential protection in *GC Micro v. Defense Logistics Agency*, 33 F.3d 1109, 1112 (9th Cir. 1994). In *Frazee v. U.S. Forest Service*, 97 F.3d 367 (9th Cir.1996), the district court supported the Forest Service's decision to release documents, against the plaintiff's reverse FOIA complaint. The Oregon district court based its decision in part on its determination, following *in camera* review, that the information contained in the documents was "publicly available and/or was taken directly from the Solicitation, from the Guidebook for Establishing and Managing Campground Concession Operations, or from other sources." *Frazee* at 369–70. Therefore, the plaintiff could not argue that the information was truly confidential.

In this case, the information satisfies the *National Parks* test. The information helps the Government's functioning, as its role as a trustee in the negotiation process is to maximize the Tribes' negotiating position. Second, disclosure of the information will hurt the Tribes' commercial position. In the *Vaughn* index, the United States describes four categories of documents that it considers exempt from disclosure under Exemption 4: 1. Information developed for the purpose of quantifying the Tribes' instream water rights for fishing purposes; 2. Information regarding the development and use of computer models of the reservation's water resources and the Tribes' water needs; 3. Information regarding the development of the Tribes' water rights claims for, and strategy in, the Montana Proceedings; and 4. Information regarding tribal budgets and funding proposals for the Tribes' efforts to prepare for the Montana proceedings.

### a. Category 1

■ Plaintiffs argue that water quantification is not commercial information. However, the Tribes, in developing a negotiating position with the State of Montana over the amount of their water rights, ought to be able to investigate the amount of water available to them as a part of creating their strategy.

An analogy might be to a manufacturer who will be negotiating for a contract to produce widgets. Information about the amount of widgets the company was capable of producing would clearly be commercial information exempt under Exemption 4. In order to figure out how many widgets can be produced, the company would have to evaluate its factories, its workforce, and its financial position. That information, if given to the government for some reason, would be exempt as it contributes to the business' market competitiveness. Here, in order to negotiate and reach a compact with the state over water appropriations, the Tribes must be able to investigate what they have. In *Joint Board of Control of the Flathead, Mission and Jocko Irrigation Districts v. United States and CSKT*, 832 F.2d 1127, 1132 (9th Cir.1987), the Ninth Circuit wrote "[w]hile the Joint Board and junior appropriators are free to contest by legal means the Tribes' and the BIA's quantification of the Tribe's fishing water rights, the Joint Board has produced, and we find, no authority that guarantees it a right to participate in the process by which the BIA and the Tribes initially establish that quantification." After the Tribes and the State have reached an agreement, perhaps the Joint Board would have the right to contest the conclusion and provide counter evidence of quantification. However, at this point, the Government needs not disclose quantification methods that include data or lead to information about quantity.

### b. Category 2

Category 2 includes information about the development of models for determining the Tribes' water quantity. There are two types of information in the *Vaughn* index related to models-the information specifically related to the Tribes' water rights, and other information related more generally to the computer model and what it does. The former is protectable because it is at the heart of the Tribes' confidential information and strategy. The latter, if it is generic information about the HYDROSS model, which I presume is commercially available and commonplace enough, is not protectable. Knowledge that the Tribes are using HYDROSS does not reveal information about the quantity of their water rights. There are a couple of documents in the index that fall into this latter category.

### c. Category 3 (development of the Tribes' water rights claims for, and strategy in, the Montana Proceedings)

This category is not specific numerical information, but, like conversations held among board members trying to decide how to steer a corporation, it is tangled up with the commercial position of the Tribes. Therefore, it is protected.

### d. Category 4 (tribal budgets and funding proposals for the Tribes' efforts to prepare for the Montana proceedings)

Category 4 is the most straightforward Exemption 4 category. It includes financial information of the Tribes. As it includes financial information, it meets the first prong of the test. The further question of whether it was received from a person is also settled. The remaining issue is whether it qualifies as confidential. Generally the answer is yes, although there are a couple of documents that may not meet the second prong of the *National Parks* test—that is, the information may already have been revealed in public documents or public fora.

### B. Exemption 5

■ Exemption 5 allows the government not to disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The United States Supreme Court discussed Exemption 5 in depth in *Department of the Interior v. Klamath Water Users Protective Association*, 532 U.S. 1, 121 S.Ct. 1060, 149 L.Ed.2d 87 (2001). The Court considered both elements of the provision: whether the documents are inter/intra-agency, and what protections are available if they are.

The issue in *Klamath* was the application of the first element, whether information given up by the Klamath Tribe qualified as "inter- or intra-agency." In *Klamath*, the Court relied on the definition of agency as found in § 551(1) and 552(f): "each authority of the Government of the United States, . . . [which] includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government . . . , or any independent regulatory agency." *Klamath Water Users*, at 9, 121 S.Ct. 1060. Independent consultants with no interests of their own are included in the scope of this protection, on the principle that the agency should be able to request, in confidence, greater authority on a particular topic than its own agents possess. *Klamath Water Users*, at 11, 121 S.Ct. 1060; *Soucie v. David*, 448 F.2d 1067 (D.C.Cir. 1971). In *Klamath*, the Tribe relied on this consultants' corollary to Exemption 5 for its communications to the DOI, but the Supreme Court rejected the argu-

ment. The Tribe could not be construed as an impartial consultant, and therefore, the intra-/inter-agency exemption was foreclosed.

■ The second element—what is protected in litigation—is defined by civil discovery privileges. *Klamath Water Users,* at 8, 121 S.Ct. 1060; *Schlefer v. U.S.,* 702 F.2d 233 (D.C.Cir.1983). These privileges protect attorney-client communication, attorney work product, and agency and executive deliberative processes. *Klamath Water Users,* at 8, 121 S.Ct. 1060; *Dow Jones & Co., Inc. v. Department of Justice,* 917 F.2d 571, 573 (D.C.Cir.1990).

The *Vaughn* index identifies several categories of information withheld under Exemption 5. These include 1.) federal officials' notes, reports, and other mental impressions, 2.) water rights claim information, 3.) federal attorney's legal deliberations and advice, and federal agency official's requests therefore, 4.) discussion papers, work plans, status reports, briefings, and opinion papers, 5.) federal deliberative documents concerning contracts and funding for the preparations for the Montana Proceedings, and 6.) draft documents. Several of these categories are undoubtedly protected under Exemption 5, as documents generated by a government agency, for a government agency.

There are a few, however, that pose a problem under the Court's ruling in *Klamath.* Some number of the documents were generated by and for federal agents for their own use and then disseminated to the Tribes. Generally, a document from a federal agency to an outside party is not protected under Exemption 5. *Dow Jones & Co., Inc. v. Department of Justice,* 917 F.2d 571, 574 (D.C.Cir.1990). Sometimes a document that is released to a Congressional actor as part of the releasing agency's deliberative process may be protected. *Rockwell International Corp. v. U.S. Dept. of Justice,* 235 F.3d 598, 604 (D.C.Cir.

2001). However, that exception appears limited to disclosures to Congressional entities. Disclosure to the CSKT would not qualify for this exemption as part of an agency's deliberative process. However, a few documents are withheld under both exemptions and are not directed disclosed here, despite a failure under qualify under Exemption 5, because Exemption 4 suffices.

1.) Federal officials' notes, reports, and other mental impressions

These documents are properly protected by Exemption 5, both under deliberative process privilege and, occasionally, attorney-client or work product privilege. However, the few documents listed in the *Vaughn* index that were disclosed to the CSKT are not exempt.

2.) Water rights claim information

This information is slightly different in the Government's hands than it is in the Tribes'. The Tribes rely on Exemption 4 for this information, because the Tribes have a real commercial and financial interest in the outcome of this proceeding. The Government does not have the same interest, even though, due to its trust obligation, it must assist the Tribes as if it did. The Government has Exemption 5 protection of this information insofar as it is involved in litigation over the Tribes' water rights and its thought-processes, deliberations, and communication related to that litigation are privileged information. ... [D]eliberative process covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath* at 8, 121 S.Ct. 1060 (citing *N.L.R.B. v. Sears, Roebuck, & Co.,* 421 U.S. 132, 150, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (internal quotation marks omitted).)

3.) Federal attorney's legal deliberations and advice, and federal agency official's requests therefore

This information is exempt from disclosure as not discoverable under regular civil discovery procedures.

4.) discussion papers, work plans, status reports, briefings, and opinion papers

These documents are exempt as deliberative process and interagency memos.

5.) federal deliberative documents concerning contracts and funding for the preparations for the Montana Proceedings

These documents would not be discoverable by a party in litigation with the agency.

F.) Draft documents.

Draft documents fall within the deliberative process exemption of FOIA. *National Wildlife Federation v. U.S. Forest Service*, 861 F.2d 1114 (9th Cir.1988); *Russell v. Department of the Air Force*, 682 F.2d 1045 (D.C.Cir.1982).

### III. Documents to be disclosed

In accordance with the foregoing analysis, most of the documents listed in the *Vaughn* index supplied by the United States are properly withheld. A number of documents were originally in the Administrative Record but the *Vaughn* index indicates they have since been disclosed or that the Government concedes they are not properly withheld. If these documents are not already disclosed, they are directed to be so.

There are a few documents that are not properly withheld and must be disclosed. The following documents in the *Vaughn* index shall be disclosed:

12. **Type of Document:** "Preliminary Draft" "Schematic Diagram"
**Subject:** Water Availability Model
**To:** CSKT
**From:** MSE–HKM, Inc. (CSKT consultant)

**Date:** 05/16/1996
**Description:** This diagram includes model nodes, model identification numbers, instream flow requirements, calibration nodes, "preliminary" irrigation duties, conveyance efficiencies, and other information. (Record nos. 27 and 137 are duplicates of this record.)
**Exemption(s) claimed:** 4
**Basis for withholding:** Category 2.

The description of this document does not appear to include information about the amount of water available to the Tribes, nor does it appear to include information from which one could easily extrapolate the amount available. It may reveal some information about how the Tribes intend to proceed in determining the amount of water available to them, but that is not exempt information under Exemption 4.

15. **Type of Document:** Draft Proposal for Water Rights Negotiation Support, 9–pages
**Subject:** Water Rights Negotiation Support for the CSKT
**To:** Bureau of Indian Affairs
**From:** Sam Morigeau (CSKT)
**Date:** 06/——/1996

**Description:** This record includes (a) a 6–page Proposal with (b) 2 attachments totaling 2–pages and (c) a one page form regarding a fiscal year 1997 request for funding. The Proposal describes a proposed work plan for the CSKT and their expert consultants to develop information related to the water rights negotiations over the next several fiscal years; the proposal discusses the background to the work, the goals of the work, a budget and a time line. The sixth page is a table with task descriptions and dollar amounts for each task in fiscal years 1997–1999. The first attachment is a

figure that relates the proposed technical work on 10 studies to a schedule for settlement of the Tribes' water rights (e.g., PIA analysis will be done during this phase; task 2 . . . etc.); the second attachment is a budgetary list that describes how much money will be spent on consultants and travel. The proposal and attachment contain marginal notes of Mr. Ewing, a member of the Federal negotiation team and employed by the BOR. Document (c) is a form that summarizes the key aspects of the Proposal.

**Exemption(s) claimed:** 4

**Basis for withholding:** Category 4.

This document could be disclosed with figures redacted.

52. **Type of Document:** 1–page draft letter

**Subject:** Data sharing agreement, etc.

**To:** Rhonda Swaney

**From:** Chris Kenney

**Date:** 11/07/1997

**Description:** This document is a draft letter from the head of the federal team to the head of the CSKT team. It discusses strategy for the data sharing agreement and the establishment of technical teams to study some specified tribal claims.

**Exemption(s) claimed:** 5(DP)

**Basis for withholding:** Category F.

Pursuant to the *Dow Jones* and *Rockwell* cases, since this information was disclosed to the Tribes, it is not exempt from disclosure.

72. **Type of Document:** 1–page letter sent by facsimile.

**Subject:** Flathead Indian Reservation

**To:** Wade Irion (Cc: Stephen Pollock)

**From:** Joe DeMaggio

**Date:** 07/20/1998

**Description:** This letter was already partially released. The redacted material describes analyses developed by the United States' litigation contractors in preparation for the Montana proceedings. The listing reveals what information the federal and tribal teams are using and indicates what studies are contemplated. All of these analyses generally relate to the economic analyses of irrigation in support of the Tribes PIA right (e.g. costs of system design and operation). This data was shared with the Tribes as part of the cooperative tribal-federal modeling effort.

**Exemption(s) claimed:** 5 (DP, WP)

**Basis for withholding:** Category B.

Pursuant to the *Dow Jones* and *Rockwell* cases, since this information was disclosed to the Tribes, it is not exempt from disclosure.

75. **Type of Document:** Table of Data and "Map Unit Interpretations: Record Schema"

**Subject:** GIS Data

**To:** n/a

**From:** (CSKT)

**Date:** 8/10/98

**Description:** The (a) table of technical data and (b) map unit interpretations include information and data regarding "component tables," "layers," "nontechnical soil descriptions," and "soil survey[s]." A duplicate of this document is document 76(b).

**Exemption(s) claimed:** 4

**Basis for withholding:** Category 2.

The description of this document does not appear to include information about the amount of water available to the Tribes, nor does it appear to include information from which one could easily extrapolate the amount available. It may reveal some information about how the Tribes intend to proceed in determining the amount of water available to them, but that is not exempt information under Exemption 4. Further, it is not clear whether

this information is available to the public in some other form (such as soil maps), and therefore it would not be exempt under the confidential prong of Exemption 4.

98. **Type of Document:** 2–page letter, 1–page of release notes, 9 separate 1–page e-mails, one 2–page attachment to e-mail

**Subject:** Little Bitterroot HYDROSS Model

**To:** (Joe DeMaggio & Mark Phillips (cc: Clayton Matt)).

**From:** (Wade Irion)

**Date:** (2/12/99)

**Description:** (a) A 2–page letter which is stamped **"CONFIDENTIAL"** and dated 02/12/1999 from Wade Irion to Joe DeMaggio and Mark Phillips (Cc: Clayton Matt) describing the transmission of a diskette containing files for the HYDROSS model, a number of e-mails and in the redacted part describing various investigative steps taken to develop this model;

(b) a 1–page of Appendix F notes regarding HYDROSS 5.0 which has marginal notes and is dated 08/26/1998;

(c) a 1–page e-mail from Wade Irion to Nancy Parker (cc: Mark Phillips and Joe DeMaggio) regarding conversion of the models to the new release of PCHSS (HYDROSS V 5.0) and dated 11/20/1998;

(d) a 1–page e-mail from Wade Irion to Nancy Parker regarding Hydross V5 and difficulty with one aspect of the model, dated 12/01/1998, at 9:00 AM;

(e) a 1–page e-mail from Nancy Parker to Wade Irion responding to the message from Irion earlier in the day, dated 12/01/1998, at 5:23 PM;

(f) a 1–page e-mail from Nancy Parker to Mark Phillips and a number of BOR personnel regarding HYDROSS/PCHSS release and describing improvements to the initial model release provided by Irion, dated 12/03/1998;

(g) a 1–page e-mail exchange between Nancy Parker and Wade Irion regarding "All is Well—Reply" and reporting on other developments and improvements with the model, dated 12/04/1998;

(h) a 1–page e-mail from Wade Irion to Nancy Parker regarding More questions and dated 12/09/1998;

(i) a 1–page e-mail from Wade Irion to Nancy Parker regarding HYDROSS—Diversion Continuation and dated 01/08/1999;

(j) a 1–page e-mail from Nancy Parker to Wade Irion regarding Little Bitterroot Models dated 01/09/1999, plus a 2–page, undated attachment discussing reservoir calculations in HYDROSS;

(k) a 1–page e-mail from Nancy Parker to Wade Irion regarding Fixed PCHSS, dated 01/19/1999.

The withheld portions of this record include information regarding the development of the Tribes' models, including comments, suggestions, structure, problems, and successes.

**Exemption(s) claimed:** 4

**Basis for withholding:** Category 2.

The description of this document does not appear to include information from which one could easily extrapolate the amount of water available to the Tribes. It may reveal some information about how the Tribes intend to proceed in *determining* that amount, but that is not exempt information under Exemption 4.

99. **Type of Document:** 1–page facsimile transmission

**Subject:** Flathead Indian Reservation HYDROSS Model Review

**To:** Wade Irion (cc: Stephen Pollock and Mark Phillips)

**From:** Joe DeMaggio

**Date:** 03/03/1999 (mistakenly dated 02/12/1999 in administrative index)

**Description:** Mr. DeMaggio comments on the operation of two aspects of the Tribes' model. Included are Mr. DeMaggio's concerns, references to some "bugs" to be worked out, technical suggestions, and requests.

**Exemption(s) claimed:** 4

**Basis for withholding:** Category 2.

The description of this document does not appear to include information from which one could easily extrapolate the amount of water available to the Tribes. It may reveal some information about how the Tribes intend to proceed in *determining* that amount, but that is not exempt information under Exemption 4.

### IV. Conclusion

Based on the foregoing, it is HEREBY ORDERED that:

The Defendant United States' and Defendant–Intervenor Confederated Salish and Kootenai Tribes' motions for summary judgment (**dkt##49 & 46**) are GRANTED. Plaintiffs' motion for summary judgment (**dkt # 53**) is DENIED.

The Clerk of Court is directed to enter judgment accordingly and to notify the parties of the making of this Order. The United States shall disclose the documents listed in Section III above.